STATE OF CONNECTICUT *v.* ERIC ASH
(14929)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON and KATZ, Js.

Argued October 27—decision released December 20, 1994

*Lauren Weisfeld*, assistant public defender, with whom, on the brief, was *Ramona S. Carlow*, special public defender, for the appellant (defendant).

*John A. East III*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Herbert E. Carlson, Jr.*, senior assistant state's attorney, for the appellee (state).

KATZ, J. The issue before the court is whether in the criminal trial of the defendant, Eric Ash, the trial court's misstatement of law on the duty to retreat under the self-defense statute, General Statutes § 53a-19,[1] was harmless beyond a reasonable doubt. The

[1] General Statutes § 53a-19 provides: "USE OF PHYSICAL FORCE IN DEFENSE OF PERSON. (a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person not-

defendant was convicted, after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1).[2] The defendant appealed that conviction to the Appellate Court, claiming that the trial court's jury instructions had contained misstatements about the duty to retreat and that these misstatements, in light of the charge as a whole, made it reasonably possible that the jury was misled. *State* v. *Ash,* 33 Conn. App. 782, 794, 638 A.2d 633 (1994). The Appellate Court agreed with the defendant's contention that the trial court's instructions had contained misstatements about the duty to retreat, but it agreed with the state that the error was harmless and affirmed the judgment of conviction. Id. We granted certification to appeal from the judgment of the Appellate Court, solely to review whether the Appellate Court properly had concluded that the trial court's misstatements were harmless beyond a reasonable doubt. *State* v. *Ash,* 229 Conn. 916, 642 A.2d 1211 (1994).[3] We reverse the judgment of the Appellate Court.

withstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law.''

[2] The defendant originally had been charged with murder in the first degree in violation of General Statutes § 53a-54 (a). The jury acquitted him of that charge and convicted him of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55, which provides in relevant part: ''MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . .''

[3] The Appellate Court also considered and rejected the defendant's claims that the trial court improperly: (1) concluded that the evidence presented by the state was sufficient to disprove beyond a reasonable doubt the defendant's defense of justification; (2) concluded that the evidence presented by the state was sufficient to sustain the defendant's conviction of manslaughter in the first degree; and (3) deprived the defendant of his federal and state constitutional rights to due process by marshaling the evidence in its jury charge. *State* v. *Ash,* supra, 33 Conn. App. 782. These other claims are not before this court.

The Appellate Court determined that the jury reasonably could have found the following facts. "On April 3, 1991, at approximately 8:30 p.m., Vincent Ellison was stabbed to death at the doorway to his apartment. The victim's apartment is located on the first floor of a dilapidated, brick building at 500 Ann Street in Hartford. The front entrance to the building opens into a large hallway on the first floor and there are two apartments located on the left side of the hallway that are visible from the front entrance. The victim's apartment was the first one on the left and James Osborne's was the second. Beyond Osborne's apartment is a short corridor leading to another apartment, not visible from the front entrance. The victim's cousin, Oscar Steve Anglin, lived in the third apartment.

"The defendant frequently visited the victim at his apartment. On April 3, 1991, the victim, the defendant and the victim's cousin, Michael Antoine Nixon, were present in the victim's apartment. The three men spent the afternoon drinking alcohol and taking drugs. At about 5:30 p.m., the defendant left the apartment to 'hustle' some money in order to obtain more drugs. He returned shortly thereafter with two sweaters he had shoplifted from a local store. At about 6 p.m., the victim sent Nixon out with directions to sell the sweaters and to purchase more drugs with the proceeds.

"When Nixon failed to return within the hour, the defendant became concerned about Nixon's absence and expressed this concern to the victim several times. The victim became angry with the defendant for mistrusting his cousin. He threatened to harm the defendant if he did not leave the apartment. The defendant then ran out of the victim's apartment into the hallway and knocked on the door to Osborne's apartment. He did not wait for Osborne to answer because he

thought the victim was pursuing him with a knife. He continued down the hallway and knocked on Anglin's door. When Anglin opened the door he saw that the defendant was carrying a large butcher knife.[4] The defendant entered Anglin's apartment and pleaded with him to calm the enraged victim. Anglin then stepped into the hallway to speak with the victim, who was carrying a broomstick. Anglin had shut the door behind him and the defendant locked the door from the inside. After speaking with Anglin for approximately seven to eight minutes, the victim turned and went down the hallway in the direction of his apartment. The defendant let Anglin return to his apartment and the defendant then decided to leave Anglin's apartment and to retrieve his shoes and clothes from the victim's apartment before he left the building.

"Osborne, who had overheard the voices of the defendant, the victim and Anglin coming from the direction of Anglin's apartment, opened his apartment door to see what was going on in the hallway. Osborne saw the victim first, standing in front of Osborne's apartment door, holding a broomstick and shouting loudly about 'kick[ing the defendant's] ass.' Osborne then saw the defendant walking down the hallway from the direction of Anglin's apartment with a knife in his hand. The defendant came face-to-face with the victim and stated that he was tired of his threats and that he was not going to take it any longer. At that point, the

---

[4] "Shortly after the incident Anglin told one or more police officers at the Hartford police station that earlier in the evening of April 3, 1991, at about 5 p.m., he had interceded when the defendant and the victim were threatening each other with knives. He stated that the butcher knife that the defendant was carrying when he knocked on Anglin's door at approximately 8 p.m. was the same knife he had seen the victim holding earlier.

"At trial, Anglin testified that he had no recollection of speaking with the Hartford police on April 3, 1991. He also testified that the defendant did not have a knife in his hand when he knocked at his door at approximately 8 p.m." *State* v. *Ash*, supra, 33 Conn. App. 785 n.2.

victim assumed a karate stance holding the stick with both hands and said to the defendant, 'Come on, bitch, come on.'

"The victim then swung the stick at the defendant, hitting him in the shoulder and the defendant thrust the knife at the victim. The men fought back and forth from the doorway of Osborne's apartment toward the front entrance of the building and back to the doorway of the victim's apartment. At some point during the fight, the knife and stick fell to the hallway floor.

"After several minutes of fistfighting, the victim lost his footing and fell backward onto the floor and across his apartment's threshold. The victim was lying on his back with his legs extended into the hallway and his upper torso inside his apartment. The defendant ended up on top of the victim, straddling him, while the victim struggled to push or kick the defendant off of him. In the midst of the struggle, the defendant picked up the knife from the hall floor and fatally stabbed the victim. The defendant then went into Osborne's apartment and asked for a pair of shoes. When Osborne told the defendant that he could not believe he had stabbed the victim, the defendant responded, 'I did it, and I'll do it again.' The defendant then left Osborne's apartment with the knife and a pair of Osborne's shoes, went next door to the victim's apartment to retrieve his jacket, and fled the building.

"When arrested, the defendant told the police, 'I had to stab him; I had to stab him.' At trial, however, the defendant testified that he did not recollect actually stabbing the victim although he did recall thrashing at the victim with a knife in his hand. He claimed to have been scared and confused and to have acted in self-defense." *State* v. *Ash*, supra, 33 Conn. App. 784–87.

The defendant provided a somewhat different and more detailed version of the events immediately sur-

rounding the stabbing. On the basis of his testimony, the jury could reasonably have found these following facts. The defendant did not have a knife when he left Anglin's apartment. It was the victim who, after the defendant disarmed him of his stick, first reached into his jeans and pulled out a knife. The victim then came at the defendant with the knife but slipped and dropped it. The defendant dove on the victim and started to hit him with his bare hands. During the continued melee, the victim tried to retrieve the knife. The defendant struggled to get the knife out of the victim's reach and managed to gain possession of it. As the defendant tried to get up and throw the knife out of the way, the victim continued to kick and hit the defendant in the face. With the knife in his hand, the defendant tried to block the victim's assaults. It was during that part of the struggle that the defendant stabbed the victim.

In instructing the jury regarding self-defense and the duty to retreat, the trial court stated, inter alia, ''[a] person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force, with complete safety by retreating. These are statements taken directly from the statute for your guidance. . . . As to retreating with complete safety, you must consider what was reasonable for the defendant to perceive was available as retreat or if none was available without the use of physical force, what degree of physical force was reasonably necessary to make one available. Now, in this connection, you can realize what you are doing is attempting to stand in the shoes of the defendant, as you would perceive a reasonable person to view the same situation, under the same conditions.

''So, as to retreat, you may consider the evidence that when the argument was escalating in [the victim's] apartment and that the defendant was asked to leave, whether or not he could perceive that this was an act

of wisdom to leave, taking his shoes and jacket, and leaving. Or when he was in Mr. Anglin's room and there was the opportunity of refuge—which apparently, after he was able to lock the door and before Mr. Anglin left the room to talk to [the victim], [the victim] had apparently not attempted to break into the room and even when Mr. Anglin returned, there was still the opportunity of remaining in the room.

"You may also consider the fact that in the room there was a telephone, so that there was the opportunity for looking for police assistance. When he did go out into the hall, was he in fact looking for an opportunity of leaving the building. Or as I recall his testimony, when they were fighting for some three minutes, after he had fallen on the knife, was there an opportunity of him enlisting Mr. Osborne's assistance to take custody of the knife." The jury thereafter convicted the defendant of manslaughter in the first degree, and the defendant was sentenced to the custody of the commissioner of correction for a period of twenty years. On appeal, the Appellate Court determined that the trial court's instruction on the duty to retreat had contained incorrect statements of law, but it held that the misstatements were harmless beyond a reasonable doubt. *State* v. *Ash*, supra, 33 Conn. App. 795–97.

The defendant claims that the Appellate Court improperly held that the trial court's inaccurate charge to the jury on the duty to retreat was harmless beyond a reasonable doubt. The defendant contends that despite the trial court's initial statement of the correct, subjective standard in the statutory language, the trial court's subsequent references to an objective standard made it reasonably possible that the jury was misled. Moreover, the defendant argues that the balance of the trial court's charge regarding the duty to retreat failed to cure those misstatements of law. We agree.

General Statutes § 53a-19 provides for the defense of self-defense and sets forth the circumstances justifying the use of physical force. Subsection (a) of § 53a-19 does impose an objective reasonableness requirement, providing in relevant part that "deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm." Subsection (b) of § 53a-19, which specifically sets out the duty to retreat, however, imposes only a subjective requirement. That subsection provides, in part, that a person is not justified in using deadly physical force *"if he knows* that he can avoid the necessity of using such force with complete safety (1) by retreating . . . ." (Emphasis added.) General Statutes § 53a-19 (b). "The statute requires *both* that a retreat in complete safety be available *and* that the defendant know of it. 'The self-defense statute, i.e., General Statutes § 53a-19 . . . focuses on the person . . . claiming self-defense. It focuses on what *he* reasonably believes under the circumstances and presents a question of fact [as to whether a safe retreat was available and whether he knew of it]. . . . This statutory emphasis upon the defendant further demonstrates the function of the jury in their evaluation of the self-defense claim.' (Emphasis in original.) . . . '[Section] 53a-19 (b) requires recourse to retreat in lieu of the use of physical force only when the *actor himself "knows* that he can avoid the necessity of using such force with complete safety . . . ." ' " (Emphasis added.) *State* v. *Quintana*, 209 Conn. 34, 46, 547 A.2d 534 (1988).

The relevant principles of law are not in dispute. "[A] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Bethea*, 167 Conn. 80, 83, 355 A.2d 6 (1974). This fundamental constitu-

tional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. *State* v. *Corchado*, 188 Conn. 653, 660, 453 A.2d 427 (1982). A defendant who asserts a recognized legal defense, the availability of which is supported by the evidence, is entitled as a matter of law to a theory of defense instruction. *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986); see also *United States* v. *Alfonso-Perez*, 535 F.2d 1362, 1365 (2d Cir. 1976)." (Internal quotation marks omitted.) *State* v. *Anderson*, 227 Conn. 518, 526, 631 A.2d 1149 (1993).

An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. *State* v. *Fuller*, supra, 199 Conn. 278 ("[w]here the legislature has created a legally recognized defense . . . this fundamental constitutional right includes a proper jury instruction on the elements of the defense . . . so that the jury may ascertain whether the state has met its burden of disproving it beyond a reasonable doubt"); see General Statutes § 53a-12 (a) ("[w]hen a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt"). In either instance, "[t]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled."[5] *State* v. *Anderson*, supra, 227 Conn. 526–27.

In determining whether the jury was misled, "[i]t is well established that [a] charge to the jury is not to be

[5] The certified question on this appeal asks whether the trial court's misstatements were harmless beyond a reasonable doubt. *State* v. *Ash*, supra, 229 Conn. 917. "We have equated this constitutionally required formulation of the harmless error standard; see *State* v. *Coleman*, 14 Conn. App. 657, 678–81, 544 A.2d 194, cert. denied, 208 Conn. 815, 546 A.2d 283 (1988);

critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. *State* v. *Estep*, 186 Conn. 648, 651–52, 443 A.2d 483 (1982); *State* v. *Harris*, 172 Conn. 223, 226, 374 A.2d 203 (1977); *Farlow* v. *Connecticut Co.*, 147 Conn. 644, 648, 166 A.2d 202 (1960); *Amato* v. *Desenti*, 117 Conn. 612, 617, 169 A. 611 (1933). The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Reed*, 174 Conn. 287, 305, 386 A.2d 243 (1978); *State* v. *Holmquist*, 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977). The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. *State* v. *Roy*, 173 Conn. 35, 40, 376 A.2d 391 (1977); *State* v. *Mullings*, 166 Conn. 268, 274–75, 348 A.2d 645 (1974). *State* v. *Estep*, [supra, 652]. *State* v. *Maturo*, 188 Conn. 591, 599, 452 A.2d 642 (1982). *State* v. *Jasper*, 200 Conn. 30, 37, 508 A.2d 1387 (1986)." (Internal quotation marks omitted.) *State* v. *Dyson*, 217 Conn. 498, 501–502, 586 A.2d 610 (1991). "The charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict. *State* v. *Williams*, 182 Conn. 262, 269, 438 A.2d 80 (1980). *State* v. *Fuller*, supra, [199 Conn.] 279." (Internal quotation marks omitted.) *State* v. *Anderson*, supra, 227 Conn. 532.

The Appellate Court properly determined that the trial court had misstated the applicable law when it

with our formulation that an instructional constitutional error is harmless if there is no reasonable possibility that the jury was misled. See *State* v. *Mercer*, 208 Conn. 52, 73–74, 544 A.2d 611 (1988). We perceive no functional difference between the two formulations." *State* v. *Cerilli*, 222 Conn. 556, 584 n.16, 610 A.2d 1130 (1992).

instructed the jury to consider "what was reasonable for the defendant to perceive was available as retreat" and to view the defendant's actions "as you would perceive a reasonable person to view the same situation, under the same conditions." These words incorrectly suggested that the statute permitted the jury to measure the defendant's knowledge of his ability to retreat according to an objective standard of "reasonableness" rather than the subjective standard of the defendant's actual knowledge. See *State* v. *Quintana,* supra, 209 Conn. 46. Neither the defendant nor the state disagrees with this conclusion. The parties do disagree, however, about whether these statements, when viewed in the light of the trial court's other instructions regarding the duty to retreat and the charge as a whole, and viewed in the context of the contested facts of the case, made it reasonably possible that the jury was misled.

The Appellate Court determined, and the state contends, that the trial court's misstatements were harmless beyond a reasonable doubt because they were preceded and followed by correct statements of law. More precisely, the state argues that the inaccurate passages were cured by the trial court's prior verbatim statement of the relevant statutory language and the subsequent instruction that "you may consider the evidence that when the argument was escalating in [the victim's] apartment and that the defendant was asked to leave, whether or not *he could perceive* that this was an act of wisdom to leave . . . ." (Emphasis added.) We are unpersuaded.

We acknowledge that the trial court first stated the statutory language correctly. The state implicitly recognizes, however, that this accurate recitation of the statutory language, subsequently clouded by the trial court's misstatements of law, was insufficient, by itself, to instruct the jury properly on the defendant's duty to retreat. The state therefore argues that the trial

court's improper references to an objective standard were cured by the remainder of its charge on the duty to retreat. We disagree. Viewing the charge in its entirety, we are unpersuaded that the trial court's subsequent use of the words "*could* perceive" (emphasis added) in its explanation sufficiently reoriented the jury to the proper subjective standard of actual knowledge. On the contrary, by further instructing the jury to consider what avenues of retreat the defendant "*could* perceive," (emphasis added) rather than directing them to consider what the defendant *did* perceive, the trial court, at best, further muddied the jury's understanding of the proper subjective standard and, at worst, suggested to the jury that it could reject the defendant's claim of self-defense if it found he could have perceived, but did not actually *know*, that he could have avoided using deadly physical force in complete safety by retreating.

In the alternative, the state, citing to the Appellate Court's decision, argues that the misstatements were harmless beyond a reasonable doubt because there was ample evidence at trial to support the jury's rejection of the defendant's claim of self-defense. The state emphasizes that "the evidence that the defendant employed unreasonable force, and/or had provoked the victim, and/or had entered into an agreement to combat, was overwhelming, and thus the jury's verdict was not dependent upon the retreat issue. Second, even if the jury considered the retreat issue, there was sufficient evidence presented at trial demonstrating that the defendant was aware of several avenues of escape, which he neglected to utilize in lieu of employing deadly force on the victim."

While we agree that the question of harmlessness of a jury instruction is properly gauged by reference to both the language of the entire charge and the evidence in the case; see *State* v. *Mercer,* 208 Conn. 52, 73, 544

A.2d 611 (1988); we find the state's argument unavailing, for two reasons. First, it primarily serves to rebut the defendant's claim that there was insufficient evidence for the jury to reject his self-defense claim beyond a reasonable doubt, which the Appellate Court previously decided against him and is not before this court.[6] Second, and more important, the state's argument, in effect, ignores the evidence that, given the most favorable reading from the defendant's perspective; *State* v. *Fuller*, supra, 199 Conn. 278; if credited, provided a factual basis for the defendant's right to a proper charge. The defendant testified that he did not have a knife prior to the fight. Rather, the victim had pulled out a knife, came at the defendant, tried to stab him, slipped and dropped the knife, continued to kick and hit the defendant in the face and tried to retrieve the knife as the struggle continued. There was ample evidence to support a finding that the state had not proved that the defendant knew he could retreat with complete safety. The instruction as given neglected to place what the defendant did perceive before the jury and instead allowed it to reject his claim of self-defense based upon a finding that he could have perceived an ability to retreat with complete safety. This issue was a critical circumstance in the jury's evaluation of his claim of self-defense. Considering the charge from the standpoint of its effect on the jury in guiding it to a proper verdict; *State* v. *Williams*, 182 Conn. 262, 269, 438 A.2d 80 (1980); it is reasonably possible that the jury was misled.

---

[6] In emphasizing the strength of its evidence against the defendant's claim of self-defense, the state goes so far as to suggest that the defendant was never entitled to an instruction on self-defense. The state asserts that "self-defense is neither a viable nor credible theory of defense and was not available to the defendant. Based upon such facts the trial court justifiably could have refused to instruct the jury regarding self-defense." Because the state never objected to the instruction at trial, however, it is improper for it now to attempt to show the harmlessness of the trial court's misstatements by

Nonetheless, the state argues that the trial court's misstatements concerning the duty to retreat were harmless beyond a reasonable doubt based on the rationale of our decision in *State* v. *Quintana,* supra, 209 Conn. 46–48. In *Quintana,* the jury convicted the defendant of felony murder after being presented with two different theories to explain the circumstances that caused the defendant to stab the victim with a knife. Id., 47–48. The defendant's witness had testified that the defendant had stabbed the victim in self-defense to thwart the victim's unprovoked attack. Id., 47. Another witness had contradicted this testimony, claiming that the defendant had stated that he had used the knife while robbing the victim. We concluded that "[t]he jury's verdict can fairly be read to indicate a choice between these two inconsistent versions of the stabbing . . . ." Id. Thus, we held that the trial court's improper injection of an objective standard into its instructions on the defendant's duty to retreat under the self-defense statute was harmless beyond a reasonable doubt because " '[t]he principal factual issues . . . were not classically dependent upon [the subtleties of the law of self-defense] for their proof, as is true in cases where the principal factual issue is the . . . [defendant's subjective knowledge of the availability of safe escape].' " Id., 47–48.

Unlike the circumstances in *Quintana,* the state's case here hinged substantially on whether the defendant, at some point either prior to or during the fatal altercation, failed to retreat within the meaning of the self-defense statute. As the defendant rightly argues, because there was no real question of identity or causation, the contested issues were intent and whether the state had disproved the defendant's claim of self-defense. Indeed, testimony concerning the victim's

---

asserting that "the defendant could only have benefitted from an instruction as to the duty to retreat, no matter how inadequate." See Practice Book § 4185.

often violent and erratic behavior, and the defendant's knowledge of that behavior, raised a significant question about whether the defendant subjectively knew that he could avoid the use of force with complete safety by retreating.[7] That this point was central to the case at trial is further shown by the state's protracted treatment of the issue during its closing argument.[8] Consequently, we conclude, contrary to the decision of the Appellate Court, that it is reasonably possible that the trial court's instructions misled the jury.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand the case to the trial court for a new trial.

In this opinion PETERS, C. J., and BORDEN and BERDON, Js., concurred.

CALLAHAN, J. dissenting. I would affirm the unanimous judgment of the Appellate Court. I agree with the Appellate Court's opinion that on the facts of this

[7] For example, the defendant testified that "[t]here were times when [the victim] didn't get his way. He would throw a temper tantrum and start yelling, cursing, threatening, saying that he could do more than anyone else could do. He was very power stricken where he wanted everyone to give him the proper respect that he deserved." The defendant further testified that the victim had swung at him on a prior occasion.

The victim's landlord also testified about the victim's often combative and erratic behavior. He testified that the victim "was kind of a flamboyant individual. He would get loud, mouthy, argumentative. He often engaged in arguments and often times I was amazed that the arguments didn't escalate to physical violence. Somehow they would calm down."

[8] The state's closing argument detailed the various points during which the defendant, in the state's view, could have left the scene. It stated that the defendant could have: (1) stayed in Anglin's apartment, borrowed some clothes from him and used the telephone to call the police; (2) asked Anglin to go for help; (3) exited when the victim first slipped to the floor; or (4) exited after the second time the victim slipped to the floor. This emphasis on the defendant's ability to retreat, in conjunction with the overall circumstances of the stabbing, distinguishes the case from *Quintana*, in which the availability of an avenue of retreat was not a contested issue. Compare *State* v. *Anderson*, supra, 227 Conn. 532 (finding trial court's improper

case and in the context of the entire jury charge, any improper instructions concerning the defendant's duty to retreat were harmless beyond a reasonable doubt. *State* v. *Ash*, 33 Conn. App. 782, 797, 638 A.2d 633 (1994).

instruction on duty to retreat not harmless beyond a reasonable doubt where the "only contested issue in this case was whether the state had disproved the defendant's claim of self-defense"), with *State* v. *Paladino*, 19 Conn. App. 576, 578–79, 563 A.2d 321 (1989) (applying *Quintana* to find improper instruction harmless beyond a reasonable doubt where "question of retreat was relatively insignificant").