STATE OF CONNECTICUT *v.* HENRY CARTER
(AC 16682)

O'Connell, C. J., and Sullivan and Cretella, Js.

Argued February 18—officially released May 26, 1998

*Neal Cone*, assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett*, assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Stephen J. Sedensky III*, assistant state's attorney, for the appellee (state).

### Opinion

SULLIVAN, J. The defendant, Henry Carter, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a. The defendant was convicted for the same offense in 1991, but that conviction was reversed by our Supreme Court and the case remanded for a new trial.

*State* v. *Carter*, 228 Conn. 412, 636 A.2d 821 (1994). A retrial resulted in the present conviction from which the defendant now appeals. On appeal, the defendant claims that the trial court improperly (1) limited the scope of the cross-examination of a witness, (2) restricted the testimony of the defendant and his mother, (3) charged the jury on the elements of self-defense, and (4) prohibited impeachment evidence of prior felony convictions. We affirm the judgment of the trial court.

The relevant facts are set out in *State* v. *Carter*, supra, 228 Conn. 414–16. "On the afternoon of May 31, 1990, the Bridgeport police received a report of a shooting at Lugo's Market, a grocery store located on the east side of the city. When a police officer arrived at the market, he found the victim, Angel Diaz, lying face up on the floor, suffering from multiple gunshot wounds to the chest and abdomen. The victim was transported by ambulance to an area hospital where he later died from those wounds.

"Salvador Lugo, the owner of the market, had been alone in his store late that afternoon when he observed the victim enter the market, select a can of beer, and proceed into a shopping aisle near the front of the market. Lugo next observed the defendant enter the store and turn into the same shopping aisle as the victim. Due to the height of the market's display shelves, Lugo could not see into the aisle occupied by the victim and the defendant, and he heard no conversation between them. Moments after the defendant had entered the shopping aisle, however, Lugo heard three gunshots from the vicinity of the aisle and immediately thereafter observed the defendant walk slowly out of the store. Lugo then proceeded to the aisle from which the shots had been fired and found the victim lying on the floor. The victim's breathing was labored and he was bleeding from the chest.

"Lugo, who was acquainted with the defendant, provided the police with the defendant's description and directions to the defendant's home, which was located near the market. When the police arrived at the defendant's home, they were met at the door by the defendant's mother, Patricia Lindsay. She told the police that she resided there with her husband, Forrest Lindsay, and the defendant. In response to questioning by the police, Patricia Lindsay stated that her husband kept a handgun at their residence. She voluntarily produced the handgun, a .38 caliber Rossi revolver, for the police, who noted the model and serial number of the handgun and returned it to her. The police also obtained Patricia Lindsay's consent to search her home for the defendant, whom the police wanted to question, but they did not find him there.

"The following day, while searching for additional evidence at the market, the police discovered a bullet lodged behind an empty beer can in the area of the store where the victim had been shot. The police returned to the defendant's home and, with Forrest Lindsay's permission, took possession of the .38 caliber Rossi revolver. An autopsy of the victim's body revealed that his death had resulted from three gunshot wounds, including a wound caused by a bullet that had entered the victim's back and pierced his aorta. Subsequent investigation determined that one of the two bullets extracted from the victim's body and the bullet recovered from the market had been fired from the .38 caliber Rossi revolver obtained by the police from Forrest Lindsay." The defendant was later arrested and charged with murder.

I

The defendant's first claim is that the trial court violated his right of confrontation guaranteed under the sixth and fourteenth amendments to the United States

constitution and the constitution of Connecticut, article first, § 8, by refusing to allow him to cross-examine Lugo regarding whether Lugo feared Diaz.

The following additional facts are necessary for a resolution of this claim. On the day of the shooting, Lugo gave a statement to the Bridgeport police in which the following excerpted question and answer appears. An officer asked Lugo: "Did you know the Puerto Rican male that was shot?" Lugo replied: "No, I don't know his name, but once in a while he came into the store; he wasn't a regular customer." At trial, however, Lugo testified that he knew Diaz by the names "Angelo" and "Angel" as well as by the name "Potato Ass," a nickname used by Diaz' friends. Lugo testified that Diaz was a regular customer who came into the store "all the time." Lugo also testified that he would see Diaz "out on the block" with his friends. When defense counsel asked Lugo if he knew whether Diaz' friends lived in the neighborhood, the state objected on the ground of relevance, and the jurors and Lugo were excused.

Defense counsel argued that he should be allowed to inquire into the relationship between Diaz and Lugo to demonstrate that the inconsistencies in Lugo's testimony were due to Lugo's fear of Diaz. The trial court ruled that the question was outside of the scope of direct examination and that the defendant had not established a foundation sufficient to allow inquiry into Lugo's motivation or bias, areas that would be irrelevant but for the inconsistencies between Lugo's trial testimony and the statement he gave to the police. The trial court gave defense counsel the choice either to make an offer of proof to establish such a foundation or to pursue this line of inquiry in the defendant's case-in-chief. Defense counsel chose not to make an offer of proof.[1]

---

[1] In response to the court's ruling, defense counsel stated: "I think what I will do is rather than asking for an offer of proof at this time, I think I

"Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 218, 690 A.2d 1370 (1997). This right, however, is not absolute, "but may bow to other legitimate interests in the criminal trial process. . . . Such an interest is the trial court's right, indeed, duty, to exclude irrelevant evidence. The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citations omitted; internal quotation marks omitted.) Id., 219. "Impeachment of a witness for bias is a matter of right, but where no foundation has been laid by cross-examination of the witness who is under attack for bias, the decision to admit impeaching evidence is within the discretion of the court." *State* v. *Plaza*, 23 Conn. App. 543, 548, 583 A.2d 925 (1990), cert. denied, 217 Conn. 811, 587 A.2d 153 (1991).

We conclude that the trial court did not unduly restrict the defendant's cross-examination of Lugo. The court gave the defendant the option to make an offer of proof outside of the presence of the jury or to take up the matter of Lugo's fear of Diaz in his case-in-chief. The defendant was not foreclosed from asking Lugo if

will continue my cross-examination and try not to vary outside the scope of the direct . . . . I think perhaps [I will] reserve some of those questions for later. And it may turn out that during the course of this, this cross-examination, that I determine that it is necessary to make an offer of proof, but I don't think it's necessary at this time."

he feared Diaz. We find that the court's rulings relative to the cross-examination of Lugo were not improper.

## II

In his second claim, the defendant contends that certain of the trial court's evidentiary rulings violated his state and federal constitutional right to present a defense. Specifically, he claims that the trial court improperly excluded evidence of specific acts of misconduct by Diaz, excluded from evidence a 1989 police report, made comments on the evidence in the presence of the jury, and prohibited the defendant from testifying to his interpretation of a statement made to him by Diaz' friends and from testifying to the reason he purchased a gun. We address each of these claims separately.

We note at the outset that "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference. *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). . . . [E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990) . . . ." (Citations omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).

The following additional facts are necessary for a resolution of the defendant's claims. At trial, the defendant testified that he shot Diaz because he thought Diaz was going to kill him. The defendant testified that the character of the neighborhood in which he lived had deteriorated over the years and that Diaz sold drugs in front of the defendant's house. He also testified that he had had confrontations with Diaz on three separate occasions, and that he had seen Diaz in a shoot-out with a third party. The defendant testified that in 1988 or 1989 he was walking home from work around 11:30 p.m. when a car approached him. Diaz and a second

person emerged from the car and started shooting at the defendant. The defendant escaped by running away. A second incident occurred in February, 1989, when Diaz chased the defendant on a Bridgeport street with an Uzi semiautomatic machine gun. On that occasion, the defendant ran into a business yard where two security guards were present. The defendant called the police, reported the incident and gave a description of Diaz, whose name the defendant did not know at that time. Diaz was never arrested for that incident. A third incident took place in August, 1989, as the defendant was walking home from work. The defendant saw Diaz fire shots at him, two of which hit him in the back. He again gave the police a statement but no one was arrested for the shooting. After being hospitalized for his wounds, the defendant went to Georgia to live with relatives. He returned to Bridgeport in February, 1990, after his mother informed him that the drug dealing in his neighborhood had ceased. Shortly after the defendant's return, however, Diaz was again selling drugs in front of the defendant's house. The defendant testified that his mother would not let him walk anywhere because she feared Diaz would harm him and, therefore, he purchased a gun.

## A

The defendant argues that the trial court improperly excluded evidence of specific prior acts of misconduct and violence by Diaz that the defendant had witnessed or heard about. The testimony of the defendant's mother was similarly limited. The defendant claims that this evidence was probative of his state of mind and therefore relevant to his claim of self-defense. He asserts that the purpose of the prior acts evidence was to show his fear of Diaz, not to impugn Diaz' character, and, therefore, admission of the prior acts evidence should not have been circumscribed by the evidentiary

rules regarding character evidence. He asserts that evidence of motive is always admissible even if such evidence shows alleged acts of prior misconduct. The defendant's argument is without merit.

"When a defendant charged with murder asserts that he killed in self-defense, his state of mind—the existence and reasonableness of apprehension of such violence by the deceased as to justify the defensive measures adopted—becomes material." (Internal quotation marks omitted.) *State* v. *De Santis*, 178 Conn. 534, 539–40, 423 A.2d 149 (1979). In such a case, the defendant "may introduce evidence of the victim's violent character to attempt to show that the victim was the aggressor. *State* v. *Miranda*, 176 Conn. 107, 109–11, 405 A.2d 622 (1978). Similarly, a defendant may, if he first shows that he was aware of the victim's violent nature, introduce such [character] evidence to show his own state of mind at the time he confronted the victim, and thereby show the reasonableness of his belief that the use of force was necessary. Id., 109. A victim's violent character may be proven by reputation or opinion evidence or by evidence showing convictions for crimes of violence. Id. *It may not, however, be proven by evidence of other specific acts*. Id., 112–13." (Emphasis added.) *State* v. *Knighton*, 7 Conn. App. 223, 228–29, 508 A.2d 772 (1986). Except where character is directly in issue, a person's violent character may not be established by evidence of specific acts. *State* v. *Miranda*, supra, 112. A decedent's violent character may not be established by evidence of specific violent acts, other than convictions, "not because it is unconvincing but because it has the potential to surprise, to arouse prejudice, to multiply the issues and confuse the jury, and to prolong the trial." (Internal quotation marks omitted.) *State* v. *Smith*, 222 Conn. 1, 18, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992).

The trial court allowed the defendant to testify to violent acts that Diaz had committed against the defendant but did not allow the defendant to testify to violent acts that Diaz had committed against others. The trial court also ruled that, since the testimony was offered to show the defendant's state of mind, other witnesses could not testify to any specific acts of violence by Diaz that they may have observed. Specifically, the court prohibited the defendant's mother from testifying as to the activities she observed outside her home that led her to believe Diaz was selling drugs and from testifying as to whether she had ever seen Diaz with a weapon. The court's ruling was consistent with the law as espoused in State v. Knighton, supra, 7 Conn. App. 223. Furthermore, our review of the record indicates that the trial court precluded only generalized testimony of Diaz' drug dealing.[2] A review of the entire record does not substantiate the defendant's claim that he was prohibited from presenting evidence and a defense to the crime with which he was charged.

B

The defendant next claims that the court improperly excluded from evidence the police report of the August, 1989 shooting. Defense counsel argued that the police report would corroborate the defendant's testimony

___

[2] The court stated: "If [the defendant] has—if he specifically saw the victim participating in drug activities in front of his house and with that complaints were made to the police and there were some repercussions from that directed towards him or his family, I, I would think perhaps that would give rise to a—to some evidence that would go to his state of mind at a later confrontation or altercation with the, with [Diaz] . . . . I have to allow some evidence relating to the drug activities of Mr. Diaz as it was perceived by [the defendant] and as it would relate to, to his fear of [Diaz] because of the violent conduct with Mr. Diaz relating to drug activities, but generalities about [how] they were on—constantly out there [in front of the defendant's house] and they were putting drugs in the bushes; and they stopped me, and they inquired about some girl, and Mr. Diaz not even being present. I think that is too far removed and, and tangential to allow . . . that."

regarding the shooting and, because the police were on notice of the crime and "nothing was done" about it, the report was relevant to the defendant's state of mind. The state argued that the report was hearsay because it was offered to establish the truth of the identification the defendant gave to the police, namely, that it was Diaz who shot the defendant, and that a prior consistent statement cannot be used for this purpose. The state also claimed that the report was "self-serving."

As a general rule, a witness' prior consistent statements are inadmissible at trial. *State* v. *Hines*, supra, 243 Conn. 803. "The rationale upon which this rule is based is that the witness' story is not made more probable or more trustworthy by any number of repetitions of it." (Internal quotation marks omitted.) Id., 803–804. While exceptions to this rule exist, they are inapplicable here. See id., 804. In this case, the police report constituted a prior consistent statement of the defendant and it was not improper to prohibit its use at trial.

C

The defendant contends that the trial court improperly remarked in the presence of the jury that certain questions asked of the defendant by defense counsel elicited "self-serving" responses. During the direct examination of the defendant, defense counsel asked: "In your statement to the police [regarding the 1989 shooting] or when you talked to the police did you tell them who you believed had shot you?" In ruling on the state's objection to this question, the court stated: "Those are self-serving statements, counselor; I don't think that they're admissible." Later, defense counsel asked the defendant: "What were you trying to avoid by having somebody [drive] you places?" The state objected and the court made the following comment: "Counsel, it's so self-serving. It's, I don't know. You put me in a position [of] having me rule on almost every

question you're asking at this moment, counselor." Defense counsel argued that the question was relevant to establish the defendant's state of mind and the court overruled the state's objection.

The issue now raised by the defendant on appeal was not raised at trial. The defendant neither objected to the remarks, moved for a mistrial, nor requested a curative instruction. The defendant requests review of his claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). We do not agree that the effect of the court's comments was to deprive the defendant of his right to present a defense. See *State* v. *Maldonado*, 193 Conn. 350, 367, 478 A.2d 581 (1984). "In the context of the entire trial; see *State* v. *Harris*, 182 Conn. 220, 231, 438 A.2d 38 (1980); such a view [by the defendant] is myopic." *State* v. *Maldonado*, supra, 367.

D

The defendant next argues that the trial court improperly prohibited him from testifying about his interpretation of a threat made against him by Diaz' friends shortly before the murder and from testifying about the reason he purchased a weapon.

Prior to entering Lugo's market on the day of the murder, the defendant was confronted by two of Diaz' friends while he was standing on a street corner waiting for a bus. They asked the defendant what was "going on" between the defendant and Diaz' girlfriend and the conversation became heated. Prior to their departure, Diaz' friends told the defendant to "wait right here," whereupon, the defendant left the scene.

The defendant testified that he knew what the statement to "wait here" meant because he had "seen it many times." The trial court then sustained the state's objection to the following question asked of the defendant by defense counsel: "In your mind what did wait

right there mean?" The court ruled that, unless the individuals had indicated what they meant, the question called for conjecture. Defense counsel then asked the defendant why he did not continue to wait for the bus after Diaz' friends left, to which the defendant responded: "I wasn't gonna wait there to be killed; it's that plain and simple." The court sustained the state's objection to this question, ordered the response stricken and instructed the jury to disregard it. Defense counsel also asked the defendant why he purchased a gun, to which the defendant responded that it was because he was "being threatened." The court again sustained the state's objection to this question and asked the jury to disregard the defendant's response.

In this trial, the court gave the defendant great latitude in allowing the introduction of evidence that established, or from which it could be ascertained, that Diaz had a violent character and that the defendant feared him. We cannot conclude that the trial court abused its discretion in these rulings or that the rulings resulted in prejudice to the defendant.

### III

The defendant next claims that the trial court gave improper instructions to the jury on self-defense. He claims that the jury instruction on the duty to retreat under General Statutes § 53a-19[3] was misleading and

[3] General Statutes § 53a-19 provides in relevant part: "Use of physical force in defense of person. (a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person

harmful because it did not make clear that the duty arises only if the defendant knows that he may retreat in complete safety. He further claims that the court's charge on the reasonableness of the defendant's belief that Diaz was about to kill him or to inflict great bodily harm on him was misleading and harmful because the court instructed the jury to use an objective standard in its determination. The defendant filed a request to charge on self-defense and, thus, properly preserved his claim for review. See *State* v. *Prioleau*, 235 Conn. 274, 283 n.10, 664 A.2d 743 (1995).

The standard of review to be applied to the defendant's claim is whether it is reasonably possible that the jury was misled by the court's instruction. *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994); *State* v. *Corchado*, 188 Conn. 653, 661, 453 A.2d 427 (1982). "In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case." (Internal quotation marks omitted.) *State* v. *Prioleau*, supra, 235 Conn. 284.

In instructing the jury on self-defense and the duty to retreat, the trial court stated, inter alia, that "[a] person is not justified in using deadly physical force upon another person if *he knows* that he can avoid the necessity of using such force with complete safety by

---

if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform. . . ."

retreating. . . . A person is not necessarily justified in using deadly physical force upon another person unless his actions are reasonable under all the circumstances if *he knows* he can avoid the necessity of using such force with complete safety to himself by retreating. You must inquire from—you must inquire from a review of all the evidence whether or not the—even if the defendant were justified in reasonably believing that Mr. Diaz was about to use deadly physical force, was about to inflict great bodily harm upon him, could the defendant [have] avoided the use of deadly force by retreating from the confrontation or avoiding it all, all together. If he could have retreated with complete safety to himself at any stage of the confrontation then the use of deadly physical force would not have been justified." (Emphasis added.)

"General Statutes § 53a-19 provides for the defense of self-defense and sets forth the circumstances justifying the use of physical force. . . . Subsection (b) of § 53a-19, which specifically sets out the duty to retreat . . . imposes only a subjective requirement. That subsection provides, in part, that a person is not justified in using deadly physical force *if he knows* that he can avoid the necessity of using such force with complete safety (1) by retreating . . . . General Statutes § 53a-19 (b). The statute requires *both* that a retreat in complete safety be available *and* that the defendant know of it. The self-defense statute, i.e., General Statutes § 53a-19 . . . focuses on the person . . . claiming self-defense. It focuses on what *he* reasonably believes under the circumstances and presents a question of fact [as to whether a safe retreat was available and whether he knew of it]. . . . This statutory emphasis upon the defendant further demonstrates the function of the jury in [its] evaluation of the self-defense claim. . . . [Section] 53a-19 (b) requires recourse to retreat in lieu of the use of physical force only when the *actor himself*

*knows* that he can avoid the necessity of using such force with complete safety . . . . *State* v. *Quintana,* 209 Conn. 34, 46, 547 A.2d 534 (1988)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ash,* supra, 231 Conn. 492.

We find that the charge properly instructed the jury to measure the defendant's knowledge of his ability to retreat according to the subjective standard of the defendant's actual knowledge. The court instructed the jury that a person is not justified in using deadly force against another *"if he knows* that he can avoid the necessity of using such force with complete safety by retreating." Only after reiterating this statement did the court state that "[i]f he could have retreated with complete safety to himself at any stage of the confrontation then the use of deadly physical force would not have been justified." We conclude that it is not reasonably possible that the jury was misled by this statement, especially when it is read in conjunction with the rest of the charge on self-defense. " 'The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result.' " *State* v. *Ash,* supra, 231 Conn. 494.

The defendant also claims that the trial court improperly instructed the jury on the reasonableness of the defendant's belief that the victim was about to use deadly physical force against him, or was about to inflict great bodily harm on him. The defendant contends that the following portion of the self-defense charge was misleading: "The statute states that deadly physical force may not be used unless the actor, that is, the defendant, reasonably believes that such other person, that is, the victim, is using or [is] about to use deadly physical force; or is inflicting or about to inflict great bodily harm. Now, reasonably means what an ordinary prudent person, an ordinarily prudent man, a man of

ordinary mental and physical capacity using his faculties in a normal manner . . . might do or perceive in a given set of circumstances. A reasonable belief is a belief generated by the particular circumstance fairly creating it and honestly entertained. If we reread the statute with the facts and persons involved in this case in mind, it would state as follows: 'The defendant Henry Carter is justified in using reasonable physical force upon the victim Angel Diaz to defend himself from what he reasonably believed to be the use or imminent use of deadly physical force; and he may use such a degree of force which he reasonably believes to be necessary for such purpose . . . .' In determining what the defendant reasonably believed you should ask what would an ordinarily prudent man, a man of ordinary mental physical capacity using his faculties in a normal manner, what might he do or perceive. That is, what would a man of common sense acting in a common sense manner do under the circumstances that you find that the defendant found himself."

"Subsection (a) of § 53a-19 does impose an objective reasonableness requirement, providing in relevant part that 'deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.' " *State* v. *Ash*, supra, 231 Conn. 492. "In evaluating the defendant's belief that he was faced with the imminent use of deadly physical force, the jury must first determine whether the defendant believed that an attack was imminent, and then it must determine whether that belief was reasonable." *State* v. *Bellino*, 31 Conn. App. 385, 392–93, 625 A.2d 1381 (1993), appeal dismissed, 228 Conn. 851, 635 A.2d 812 (1994).

The trial court included in its self-defense charge an almost verbatim recitation of § 53a-19 (a). See id., 394.

Thus, the language of the charge, "like that of the statute, [set] forth the appropriate subjective-objective test for evaluating the defendant's belief concerning the danger he was facing." Id. The court then "provided the jury with additional guidance on the objective part of its inquiry by explaining how the jury would have to determine whether the defendant's belief was a reasonable one. The court necessarily referenced the objective, reasonable person at this stage of the instructions. In doing so, however, the court . . . enabled the jury properly to carry out its duty to examine the evidence both subjectively and objectively, while keeping in mind that the defendant's conduct must be judged ultimately against that of a reasonably prudent person." (Internal quotation marks omitted.) Id., 395.

The defendant's challenge to the court's instruction raises only an issue of emphasis. See id., 396. We conclude that the trial court did not focus exclusively on whether a reasonable person would have believed that he faced an imminent attack. See id. "A party is not entitled to a charge which is beyond criticism in every particular. . . . Rather, a charge is adequate if it is legally correct and presents the case to the jury in a just and fair manner." (Internal quotation marks omitted.) Id. The court properly instructed the jury as to the law of this state on the subject of self-defense.

IV

The fourth issue that the defendant argues in this appeal concerns the court's ruling prohibiting impeachment of Lugo based on two prior felony convictions occurring in 1979. Lugo had been convicted of manslaughter and carrying a pistol without a permit. The trial court prohibited the use of the prior convictions for impeachment purposes because the convictions were remote in time and were not based on crimes of falsehood. The court did allow into evidence, however, the

defendant's prior felony conviction for assault. The defendant asserts for the first time in this appeal that a crucial part of his defense depended on the comparable credibility of Lugo and himself. Thus, he argues, both prior felony records should have been allowed into evidence to enable the jury to assess the credibility of each witness properly. The argument the defendant now makes is different from the argument he made to the trial court. The defendant did argue to the trial court, however, that Lugo's prior felony convictions should be admitted into evidence. The state, but not the defendant, submitted to the trial court a request to charge on prior felony convictions. We decline to review the defendant's claim as the requirements of Practice Book § 852, now Practice Book (1998 Rev.) § 42-16, were not followed.[4]

Furthermore, we note that the defendant raised this claim in *State* v. *Carter*, supra, 228 Conn. 412. In that case, our Supreme Court found that the trial court did not abuse its discretion in precluding the introduction of Lugo's prior convictions for impeachment purposes. Id., 431. As in this case, the trial court had reasoned that such convictions were remote in time and that the offenses did not bear directly on the witness' veracity. Id., 430.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[4] Practice Book § 42-16 provides: "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. The exception shall be taken out of the hearing of the jury."