STATE OF CONNECTICUT *v.* ROBERT
F. WHITFORD
(SC 16616)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

Argued January 11—officially released July 2, 2002

*Alice Osedach-Powers*, assistant public defender, for the appellant (defendant).

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Brian Preleski*, assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[2] The defendant claims that the trial court improperly: (1) failed to define the term "initial aggressor" in charging the jury on self-defense; (2) instructed the jury regarding the defendant's duty to retreat; (3) instructed the jury on provocation as an exception to self-defense; (4) instructed the jury regarding the degree of force used by the defendant against the victim; (5) excluded evidence of prior incidents in which the victim had acted violently while intoxicated; and (6) instructed the jury to consider the comparative credibility of the defendant's and victim's varying accounts of the events for which the defendant was later charged. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, Anthony Pernal, shared an apartment in Bristol with Bonnie Courchaine and Anna Holcomb. Approximately one week prior to the incident, the defendant, Robert F. Whitford, drove to Connecticut from Georgia and began to stay at the apartment at Courchaine's invitation. His motivation for coming was twofold: first, to rekindle a romantic relationship with Courchaine; and second, to ensure that the victim, who did not get along with his roommates, vacated the apartment.

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court and we transferred the case to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

The victim and the defendant had had little contact over the course of the week leading up to their encounter. The victim had begun moving his belongings out of the apartment and planned to vacate the premises permanently on Sunday, March 14, 1999.

On Friday, March 12, 1999, Courchaine left for Georgia, where she previously had resided with the defendant, in order to retrieve some items from storage. That evening, the victim and Holcomb drank late into the night. The victim then spent the majority of the following day frequenting several bars with his cousin. Upon returning to the apartment, the victim began arguing with Holcomb, who also had been drinking. Holcomb called the police to have him arrested. Although the police responded to the call, they failed to take the victim into custody, and instead attempted to defuse the situation by asking Holcomb temporarily to leave the apartment.

After Holcomb had returned and the police had left, Holcomb remarked to the defendant, "See how nothing happens to him? He's moving out. We need to do something to him." The defendant, who also had been drinking, responded by telling the victim, "You're getting out of here now." The victim, choosing to ignore the defendant, turned and walked into his bedroom. The defendant followed and pushed the victim into his dresser. The victim felt something hit his side a few times, accompanied by sharp pains. The defendant then retreated to the living room and the victim was left alone in the bedroom, blood from his side seeping onto the carpet near the dresser. Soon thereafter, the victim walked into the living room, where the defendant told him, "I just got you good and I got you twice." The victim then dropped to his knees from the intensity of his pain.

Holcomb had been unconscious during the altercation but awoke just in time to see the victim fall. She

grabbed a towel and held it against his side in an effort to stop the bleeding. She then suggested that he lie down and get some sleep, to which the victim responded, "I think this guy really stabbed me." Holcomb insisted that she had "seen everything," and told the victim, "You just got nicked when you got pushed against the dresser."

Although the victim attempted to call for help, Holcomb ripped the telephone away from him and refused to let him use it. The victim rested briefly on the living room couch and then returned to his bedroom. Once there, he lifted his shirt to find that he had been stabbed twice, once on the arm and once in the side. He then decided to flee the apartment in an effort to seek help. He grabbed his jacket, headed out the front door and into the street, trying to locate one of the patrol cars that typically frequented the area. After seeing none, he walked down the street, trying the door of a Subway restaurant, which was locked. He continued for another block until he happened upon the Downtown Café. Once inside, he explained to the bartender that he had been stabbed and that he needed to use the telephone to call an ambulance.

The victim eventually was taken to Bristol Hospital. Upon admission, he was inebriated, abusive and belligerent. The victim remained hospitalized for one week, having suffered a superficial stab wound on his left arm and a more serious wound just below his rib cage that had penetrated through the bottom part of his lung and diaphragm, nicked his intercostal artery, and punctured his spleen. The victim's injuries could have been fatal had they not been timely identified and treated.

Although admitting that he had stabbed the victim,[3] the defendant claimed at trial that he had done so in self-

---

[3] The defendant testified that he recalled stabbing the victim only once, despite the fact that the victim's injuries consisted of two knife-inflicted wounds.

defense. He submitted the following version of events to the jury in support of his claim. After the police had left the apartment on Saturday evening, he and the victim were alone in the living room drinking and watching television; Holcomb was in her bedroom. The defendant began to discuss the problems that the roommates had been having and asked the victim why he continued to live at the apartment when he knew that Holcomb and Courchaine wanted him to move out. Suddenly, the victim jumped on top of the defendant, who was seated on the couch, and began choking him, screaming, "Nobody tells me what to do in my fucking apartment!" The defendant attempted to pull the victim's hands away from his neck, but the victim maintained his grip. In a further effort to free himself, the defendant grabbed a pocketknife off a nearby cabinet and stabbed the victim. The victim then retreated momentarily to his bedroom. He returned to the living room, whereupon Holcomb awoke and entered the room in time to see the victim fall to the carpet. The victim moved to the couch and lifted up his shirt; Holcomb saw that he was bleeding and got him a towel to hold against his wound. Shortly thereafter, the victim grabbed his jacket from his bedroom and left the apartment. Neither the defendant nor Holcomb recalled preventing the victim from using the telephone.

The trial court, having determined that the defendant offered sufficient evidence to establish a colorable claim of self-defense under General Statutes § 53a-19,[4]

[4] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person

instructed the jury accordingly. The jury returned a guilty verdict and the court rendered judgment thereon. This appeal followed.

I

In large part, the defendant's claims on appeal relate to the propriety of the trial court's jury instructions regarding self-defense.[5] Our analysis of these claims is

if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

[5] The trial court's instruction on self-defense provided as follows: "The evidence in this case raises the issue of self-defense. Self-defense is a meaning by which the law justifies the use of force that would otherwise be illegal. Once self-defense is raised in a case, the state must disprove the defense beyond a reasonable doubt. The law of self-defense does not imply the right of attack. By definition, self-defense means the use of defensive force. Therefore, a person claiming this right must act honestly and conscientiously and not for anger, malice or revenge. You must not provoke or intentionally bring the attack upon himself in order to provide an excuse to use force against another person.

"A person is justified in the use of reasonable physical force upon another when he reasonably believes that such force is necessary to protect himself from the use or imminent use of force by another.

"Self-defense is a legal defense to the use of force that would otherwise be criminal. I will now define that term to you in the legal sense. You are to follow this instruction in reviewing the evidence in this case and not apply any common or colloquial meaning to that term that you may have heard before.

"On the issue of self-defense, there is a Connecticut statute entitled, Use

## informed by the principle that "a fundamental element

of Physical Force in Defense of Person, codified at [General Statutes § 53a-19 (a)], that insofar is as is applicable to this case provides as follows: 'A person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or the imminent use of physical force and he may use such degree of force which he reasonably believes to be necessary for such purpose except that deadly physical force may not be used unless the actor reasonably believes that such other person is using or about to use deadly physical force or inflicting or about to inflict great bodily harm.'

"In this case, we are talking about the use of deadly physical force by the defendant. It is, therefore, the last portion of that section in the statute on self-defense that is implicated in this case. I'm going to read it again to you. Deadly physical force may not be used unless the actor, meaning the defendant, reasonably believes that such other person, meaning the victim, Anthony Pernal in this case, is using or about to use deadly physical force or inflicting or about to inflict great bodily harm on him.

" 'Deadly physical force' means physical force that can reasonably be expected to cause death or serious physical injury. Deadly physical force need not necessarily result in death.

" 'Serious physical injury' means injury that creates a substantial risk of death or that causes serious disfigurement, serious impairment of health, or serious loss or impairment of function of any bodily organ.

"Great bodily harm is not limited by the definition of serious physical injury and may encompass other acts of the victim such as sexual assault or the threat of sexual assault. The term 'great' has its ordinary meaning and [connotes] a bodily harm that is substantially more than minor or inconsequential harm.

"The word 'using' has its ordinary meaning; that is, that the other person has already commenced the use of force. The words 'about to use' have their ordinary meaning and [connote] an act ready to take place or about to occur and not an act that is to take place at some other specified future time.

"As I had said earlier, the defendant does not have to prove that he acted in self-defense, but if self-defense is raised in a case—and it has been raised in this case—then it is the state's burden to disprove that defense beyond a reasonable doubt.

"The statute focuses on the person claiming self-defense. It focuses on what he reasonably believed under the circumstances and presents a question of fact for the jury. In other words, what is important is what the defendant reasonably believed under the circumstances in this case. You must also consider, however, what the defendant, in fact, believed was objectively reasonable under the circumstances. Thus, you must first determine whether the defendant believed that an attack was imminent or about to occur and then you must determine whether that belief was reasonable.

"Similarly, you must determine whether the degree of force used was reasonable. The test for the degree of force in self-defense is a subjective/

of due process of law" is the right of a defendant

objective test meaning it has some subjective aspects and some objective aspects. Self-defense thus requires the jury to measure the justifiability of the defendant's action from the subjective perspective; that is, what the defendant reasonably believed under the circumstances presented in this case and on the basis of what the defendant perceived the circumstances to be.

"Section 53a-19 (a) requires, however, that the defendant's belief must have been reasonable and not irrational or unreasonable under the circumstances; that is, when a reasonable person in the defendant's circumstances have reached that belief; that is the objective aspect of the test. It is both a question of what his belief was and whether it was reasonable.

"In this case, if you find proven beyond a reasonable doubt that the victim was not using or about to use deadly physical force or inflict great bodily harm upon the defendant or if you find proven beyond a reasonable doubt that the defendant had not reasonable belief that the victim was using or about to use deadly physical force or about to inflict great bodily harm upon the defendant, then the defendant would not be justified in using deadly physical force upon the victim. You would, under those conditions, reject the defense of self-defense.

"The law recognizes an exception to the justification of the use of deadly physical force as self-defense. Subsection (b) of § 53a-19 insofar as it relates to this case, provides as follows: Notwithstanding the provisions of subsection (a), which provides the use of reasonable force, a person is not justified in using deadly physical force upon another person if he knows that he could avoid the necessity of using such force with complete safety by retreating.

"The statute requires both that the retreat was completely safe and available and that the defendant knew of it. 'Complete safety' means without any injury whatsoever to him.

"The self-defense statute focuses on the person claiming self-defense. It focuses on what he reasonably believes under the circumstances and presents a question of fact as to whether a safe retreat was available and whether the defendant subjectively knew of it. Retreat is only required where the defendant himself knows that he can avoid the necessity of using physical force with complete safety.

"If you find proven beyond a reasonable doubt that a safe retreat was available and that the defendant knew about it, you should reject the self-defense claim. The law stresses that self-defense cannot be retaliatory. It must be defensive and not punitive. So you must ask yourself, didn't the defendant know that you could avoid the use of deadly physical force by retreating safely? If so, and yet he chose to pursue the use of deadly physical force, you should reject the self-defense claim if you find that beyond a reasonable doubt.

"You must also reject the defendant's self-defense claim if the state proves beyond a reasonable doubt that the defendant provoked the use of physical force by the other person. In order to provoke the use of physical force by

charged with a crime to establish a defense. *State* v. *Bethea*, 167 Conn. 80, 83, 355 A.2d 6 (1974). We previously have held that " '[t]his fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified.' " *State* v. *Ash*, 231 Conn. 484, 492–93, 651 A.2d 247 (1994).

Where, as here, the challenged jury instructions involve a constitutional right, the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict. *State* v. *Anderson*, 227 Conn. 518, 526–27, 631 A.2d 1149 (1993). In evaluating the particular charges at issue, we must " 'adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a

another, it's not enough that the defendant, by his conduct, elicited the use of physical force by another, rather that the defendant must have embarked upon such conduct with a specific intent to provoke the other into using physical force and intending to cause the other physical injury or death—to death.

"You must also reject the defendant's self-defense claim if the state proves beyond a reasonable doubt [that] the defendant was the initial aggressor and did not adequately retreat. If you find that the defendant was the initial aggressor, the defendant's use of force may still be justified if he withdrew from the encounter and made it clear to the other person that he was retreating from the use of force.

"In summary, it's the burden of the state to disprove the claim of self-defense beyond a reasonable doubt. The state may do so by providing any one of the following beyond a reasonable doubt—by proving any one of the following beyond a reasonable doubt: (1) that the defendant did not believe that deadly physical force was being used or about to be used or the infliction of great bodily harm was imminent; (2) that the defendant did not have reasonable grounds to believe that deadly physical force was being used or about to be used or the infliction of great bodily harm was imminent; (3) that the deadly physical force used by the defendant was unreasonable; (4) that the defendant was the initial aggressor and did not withdraw from the encounter; (5) that the defendant provoked the use of deadly physical force by the other person; (6) that the defendant knew that he could have retreated in complete safety.

"Should the state prove any of these elements to you beyond a reasonable doubt, the defendant cannot prevail in his claim of self-defense."

whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view [them] as improper.' " *State* v. *Aponte*, 259 Conn. 512, 517, 790 A.2d 457 (2002).

## A

The defendant first claims that the trial court improperly failed to define the term "initial aggressor" after instructing the jury that it "must . . . reject the . . . self-defense claim if the state proves beyond a reasonable doubt [that] the defendant was the initial aggressor." According to the defendant, the court's failure in this regard could have misled the jury into believing that the defendant was the initial aggressor simply because he instigated a verbal exchange with the victim that ultimately lead to their violent encounter. The state, however, argues that there is no reasonable possibility that the jury was misled because: (1) neither the state nor the defendant ever had suggested that mere words were sufficient to confer upon either party the status of "initial aggressor"; and (2) the court's instruction, taken as a whole, expressly linked the term "initial aggressor" with the use of force, thereby precluding any inference that the defendant was the initial aggressor because he started a contentious conversation with the victim. We agree with the state.

As a preliminary matter, we note that the defendant neither filed a request to charge regarding the definition of initial aggressor[6] nor excepted to the trial court's instruction as given. Accordingly, he seeks to prevail

---

[6] We further note that, in fact, the defendant failed to file any requests to charge with the court.

on this claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40. We also have held that "[t]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." *State* v. *George B.*, 258 Conn. 779, 784, 785 A.2d 573 (2001); *State* v. *Woods*, 250 Conn. 807, 815, 740 A.2d 371 (1999).

That the first two prongs of *Golding* are satisfied in the present case is uncontested: the record is adequate for review; and, as previously stated, the claim that the trial court improperly instructed the jury regarding self-defense is of constitutional dimension. We thus proceed to a consideration of the third prong, namely, whether the alleged constitutional violation exists and whether it deprived the defendant of a fair trial. We conclude that the defendant's claim regarding the trial court's failure to define the term "initial aggressor" does not satisfy the third prong of *Golding* and, accordingly, we deem the trial court's instruction on self-defense proper in this regard.

We agree with the defendant that inviting "the discussion of a subject as to which animus existed between the parties . . . does not by itself make . . . [one] the aggressor." (Internal quotation marks omitted.) *State* v. *Corchado*, 188 Conn. 653, 667 n.15, 453 A.2d 427 (1982). The mere fact that the defendant properly cites

to a proposition of law related to the claim of self-defense, however, does not entitle him to an instruction thereon. See *State* v. *Lemoine*, 256 Conn. 193, 201, 770 A.2d 491 (2001) ("[t]o require that the jury be instructed, not only on matters at issue, but also on all arguably related but factually inapplicable areas of the law not only would be impractical, but would impair the jury's understanding of the relevant legal issues"). As previously stated, to prevail on his claim of instructional impropriety the defendant must establish that the court's failure to define the term "initial aggressor" reasonably could have misled the jury into rejecting his claim of self-defense. This is a burden that the defendant cannot sustain on the record presently before us.

The trial in this case consisted of only one day of testimony, during which the jury was confronted with two different versions of the incident communicated largely through the defendant and the victim. At no point during the taking of evidence, or during opening and closing arguments, did either party emphasize the initial aggressor doctrine and its application to the facts of the present case. Nor was there any suggestion that, simply because the defendant started a conversation with the victim that purportedly triggered their physical encounter, he was the culpable party. In the absence of some evidentiary basis for the jury to find that the defendant was the "initial aggressor" by virtue of his initiation of the verbal exchange, we conclude that there is no reasonable possibility that the jury was misled by the court's failure to define that term. This is especially the case where, as here, the court gave the subsequent instruction: "If [the jury were to find] the defendant was the initial aggressor, the defendant's use of force may still be justified if he withdrew from the encounter and made it clear to the other person that he was retreating from the use of force." Although appearing in the context of a charge regarding the defendant's

duty to retreat, this express coupling of the term "initial aggressor" with the phrase "use of force" clearly indicates that only a physical, as opposed to verbal, act would have sufficed to qualify the defendant as the initial aggressor.

The defendant relies on *State* v. *Jimenez*, 228 Conn. 335, 342, 636 A.2d 782 (1994), in support of his claim of instructional error. That case, however, is inapposite. At issue in *Jimenez* was the propriety of a jury instruction, which, unlike that in the present case, specifically defined the term "initial aggressor" as " 'the first to use physical force.' " Id., 338. Because "[t]he undisputed facts at trial were that the defendant had been the first to use physical force"; id., 340; and because the defendant had claimed to have used force in response to an imminent threat, we concluded that "[t]he effect of the court's [jury] instruction . . . was to take away with one hand the defense it had permitted the jury to consider with the other." Id.

We also noted in *Jimenez* that the substance of the court's charge was incorrect as a matter of law. After analyzing the plain language and import of § 53a-19, the self-defense statute, we determined that, were the term "initial aggressor" to be construed in the manner provided for in the court's charge, the defense essentially would be emasculated. Id., 340–41. That is because "§ 53a-19 contemplates that a person may respond with physical force . . . without becoming the initial aggressor and forfeiting [his claim] of self-defense. Otherwise, in order to avoid being labeled the aggressor, a person would have to stand by meekly and wait until an assailant struck the first blow before responding. . . . Such a bizarre result could not have been intended by the legislature." Id., 341. Given the legal impropriety of the instruction, coupled with its effect, on the facts of the case, of "foreclos[ing] the defendant from his right to have the jury pass upon his claim of self-

defense," we held that it was reasonably possible that the jury was misled by the court's charge. Id., 342.

The jury instruction challenged in the present case is markedly different from that of *Jimenez*. First, the court's failure to define the term "initial aggressor" in the present case reasonably cannot be said to have prevented the jury from considering the claim of self-defense altogether, as did the trial court's affirmative charge in *Jimenez*. As previously stated, the court in *Jimenez* explained that the "initial aggressor" in the encounter was " 'the first to use physical force.' " Id., 338. Because, in *Jimenez*, it was undisputed at trial that the defendant had, in fact, been the first individual to use such force, the trial court's charge conclusively decided the claim of self-defense for the jury. Id., 340. In the present case, however, the trial court simply instructed the jury that, if it were to find that the defendant had been the initial aggressor in his encounter with the victim, his claim of self-defense would be defeated. Such instruction left the jury free to weigh the evidence adduced at trial and to choose whether, on the facts as it found them, the defendant had presented a viable self-defense claim. Therefore, the concern that the defendant was foreclosed from establishing a defense, present in *Jimenez*, is absent on the facts of this case. Second, the trial court's instruction on initial aggressor in the present case was, unlike that in *Jimenez*, legally correct and given in accordance with the relevant statute. As a result, the defendant's reliance on *Jimenez* is unpersuasive.

## B

The second fault the defendant finds with the trial court's charge on self-defense lies in the instruction that "a person is not justified in using deadly physical force upon another . . . if he knows that he could avoid the necessity of using such force with complete

safety by retreating."[7] According to the defendant, because there was no evidence to indicate that the option of retreat was available, it was improper for the court to give the factually unsupported instruction. The state contends, to the contrary, that sufficient evidence was adduced at trial to justify the court's charge regarding retreat. The state argues, moreover, that even if the instruction was based on insufficient facts, it is not reasonably possible that the jury was misled by it. We agree with the state that the instruction, although improper, was harmless.

Our analysis of this claim is guided by the principle that " '[t]he court . . . has a duty not to submit to the jury, in its charge, any issue upon which the evidence would not reasonably support a finding.' " *State* v. *Beltran*, 246 Conn. 268, 274, 717 A.2d 168 (1998); *State* v. *Diggs*, 219 Conn. 295, 299, 592 A.2d 949 (1991); *State* v. *Williams*, 202 Conn. 349, 364, 521 A.2d 150 (1987). We thus review all of the evidence adduced at trial in order to discern whether there had been a sufficient basis from which the jury reasonably could conclude that the defendant had a duty to retreat prior to using force against the victim.

The defendant's evidence concerning the stabbing consisted solely of his own testimony and was factually inconsistent with an instruction regarding the duty to retreat. According to the defendant, the victim jumped

---

[7] Section 53a-19 (b) (1) also provides, however, that "the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor . . . ." " 'Dwelling' " is defined under General Statutes § 53a-100 (a) (2) as "a building which is usually occupied by a person lodging therein at night . . . ." Although this exception to the duty to retreat conceivably could have been available to the defendant in the present case, he neither filed a request to charge thereon, nor excepted to its omission in the trial court's instruction. The defendant, moreover, did not argue the applicability of this section on appeal. Accordingly, we do not consider it in deciding his claim of instructional impropriety.

on top of him without warning and began strangling him. The defendant testified that he attempted, unsuccessfully, to free himself by removing the victim's hands from his throat prior to using the pocketknife. Given this factual scenario, the jury reasonably could not have determined that there existed any opportunity for the defendant to retreat safely prior to using force.

The state's evidence, likewise, offered no support for the challenged instruction. The state, choosing affirmatively to advocate for the victim's version of events, presented no evidence tending directly to defeat the claim of self-defense. The state's case was thus presented largely through the testimony of the victim, who maintained that the defendant, unprovoked, assaulted and stabbed him in his bedroom. This factual scenario, however, does not even raise the issue of whether the defendant was justified in using force. It therefore cannot form the basis of an instruction on an exception to the claim of self-defense.

The state contends that its exhibit depicting the layout of the apartment was sufficient evidence upon which to base the challenged instruction.[8] In light of

[8] The state also cites to *State* v. *Ash*, supra, 231 Conn. 484, as authority for the proposition that a retreat instruction may be warranted where, as here, the defendant claims that he stabbed the victim in self-defense after the victim had initiated the altercation. That case, however, is factually distinguishable.

In *Ash*, both the state's and the defendant's versions of the altercation provided adequate grounds upon which the jury reasonably could have inferred that the opportunity for retreat was available as an alternative to using force. According to the state, the altercation had occurred in the hallway of the victim's building, which had direct access to an exit onto the street. Id., 487. The victim, broomstick in hand, had threatened the defendant and had gone so far as to hit him once with the broomstick prior to the defendant charging at him with a knife. Id., 488–89. Testimony was presented indicating that " '[t]he men fought back and forth from the doorway of [an] apartment toward the front entrance of the building and back to the doorway of the victim's apartment. . . . After several minutes of fistfighting, the victim lost his footing and fell backward onto the floor and across his apartment's threshold. . . . The defendant ended up on top of the victim, straddling him . . . . In the midst of the struggle, the defendant

the foregoing discussion, however, it becomes apparent that this evidence was irrelevant to the question of whether the defendant had a duty to retreat prior to using force. The version of events supplied by the state did not even implicate the issue of self-defense; no duty to retreat therefore could exist on the facts as communicated by the victim, rendering the layout of the apartment superfluous. Moreover, the proximity of the altercation to the apartment's exit was irrelevant under the defendant's account of the stabbing, in which the opportunity to retreat was a physical impossibility. Because our review of the record fails to identify any evidence upon which the jury reasonably could have found the existence of a duty to retreat,[9] we conclude that the court's instruction was improper.

. . . fatally stabbed the victim.' " Id., 489. These facts, as conveyed by the state's witnesses, not only adequately portrayed the proximity of the altercation to the exit of the building, but also suggested that the defendant may have had the opportunity to escape rather than engaging in hand-to-hand combat with the victim.

The defendant's version of the altercation similarly provided a sufficient factual basis upon which to charge the jury regarding the duty to retreat. According to the defendant, the victim first came at him with a knife, but slipped and dropped it on the ground. Id., 490. At that point, "[t]he defendant dove on the victim and started to hit him with his bare hands," during which struggle the defendant stabbed the victim. Id. The defendant's account of the incident thus revealed that, when the victim dropped his weapon, the defendant might have been able to flee as an alternative to attacking the victim. Given the facts as reported by both the state's and the defendant's witnesses, the court had sufficient grounds upon which to base an instruction regarding the duty to retreat as an exception to a valid claim of self-defense. Facts of similar force and effect were not established in the present case, however, thereby rendering the court's instruction on retreat improper.

[9] It is axiomatic that the jury, in its role as fact finder, may choose to believe all, some or none of a witness' testimony. See *Close, Jensen & Miller* v. *Lomangino*, 51 Conn. App. 576, 588, 722 A.2d 1224, cert. denied, 248 Conn. 905, 731 A.2d 309 (1999); *State* v. *Fullard*, 5 Conn. App. 338, 342, 497 A.2d 1041 (1985). Where, however, as here, the jury is presented with two totally inconsistent and conflicting stories, neither of which provides factual support for an instruction on the duty to retreat, there is no alternative version of events that may be distilled to serve as an adequate foundation for a charge on retreat as an exception to self-defense.

Although we take issue with the self-defense charge in this respect, we agree with the state that the error was harmless. In our view, this issue is largely controlled by our decision in *State* v. *Quintana*, 209 Conn. 34, 547 A.2d 534 (1988). The defendant in *Quintana* appealed to this court from his conviction of felony murder, arguing that the trial court's instruction on the duty to retreat "impermissibly [had] replaced the subjective-objective standard contemplated by the [self-defense] statute with a simple objective standard." Id., 46. As part of its instruction on self-defense, the trial court had charged the jury that, " 'in most circumstances, a person must retreat from the perceived harm if he is able to do so with complete safety.' " Id.

We agreed with the defendant in *Quintana* that the instruction was improper, but held, nonetheless, that the error was harmless. Id. In reaching such a conclusion, we observed that the only evidence regarding self-defense was supplied by the testimony of one witness, and that her version of events was directly contradicted by the testimony of a second witness. Id., 47. We stated that, "[i]n this posture . . . the evidence presented to the jury can fairly be said to center on the credibility of [the] self-defense version of the stabbing, measured against the credibility of [other] testimony that an attempted robbery was the motivating force behind the [assault]." Id. Because "[t]he jury's verdict [therefore, could] fairly be read to indicate a choice between . . . two inconsistent versions of the stabbing . . . [t]he principal factual issues . . . were not classically dependent upon [the subtleties of the law of self-defense] for their proof, as is true in cases where the principal factual issue is the . . . [defendant's subjective knowledge of the availability of safe escape]." (Citation omitted; internal quotation marks omitted.) Id., 47–48. As a result, we held that the trial court's improper instruction did not constitute reversible error. Id., 48.

The manner in which the present case was tried is analogous to that of *Quintana*. The defendant sought to establish his self-defense claim only through his own testimony. The state, on the other hand, presented evidence to suggest that the defendant attacked the victim of his own volition in an attempt forcibly to persuade him to vacate the apartment. The state did not, however, introduce any evidence tending directly to defeat the particular elements necessary to establish the defendant's claim of self-defense. Thus, the jury here ultimately was faced with a credibility contest between two inconsistent versions of the altercation, as had been the jury in *Quintana*. The rule in *Quintana*, therefore, applies with equal force to the claimed instructional error now at issue: because " '[t]he principal factual issues [in the case] . . . were not classically dependent upon [the subtleties of the law of self-defense] for their proof' "; id., 47–48; the improper instruction reasonably cannot be said to have misled the jury.

C

The defendant next claims that it was improper for the trial court to instruct the jury on provocation because such an instruction was unsupported by the evidence. The state argues, to the contrary, that a sufficient factual basis for the instruction did exist.

As part of its charge on self-defense, the trial court instructed the jury that it "must . . . reject the defendant's self-defense claim if the state proves beyond a reasonable doubt that the defendant provoked the use of physical force by the other person." The provocation element of § 53a-19 (c) (1) requires that a person act with the specific intent to elicit the use of physical force by another person in order to cause physical injury or death to that person. Our case law interpreting that statute has established that, in order to prove provocation, the state must demonstrate that the defendant

possessed a "dual intent: (1) the intent to cause physical injury or death, and (2) the intent to provoke." *State* v. *Turner*, 33 Conn. App. 616, 619, 637 A.2d 3 (1994). The defendant in the present case argues that the lack of evidence regarding his alleged intent to provoke the victim into using force rendered the court's instruction improper. We agree with the defendant that this instruction should not have been given, but we conclude that the impropriety was harmless.

In its brief, the state points to the victim's statement to police as supplying sufficient evidence to support the trial court's instruction on provocation. Therein, the victim revealed that: Courchaine had told the defendant, prior to his arrival, that " 'the victim was giving her a hard time' "; he had spoken with the defendant, again, prior to his arrival, and had been informed that " 'he was coming up to take care of business' "; and he believed Courchaine "had been trying to get someone to beat . . . [him] up for awhile . . . ." The trial court initially indicated that it would admit the statement as a full exhibit. Subsequently, however, the court ruled that the statement was being admitted on the issue of the victim's credibility only, and not for its truth. The court instructed the jury accordingly. As a result of the limited admissibility of the victim's statement, its contents may not be used substantively to support the instruction on provocation. The state points to no other evidence from which the jury reasonably could conclude that the defendant intended to provoke the victim into using force. Because there was thus no factual basis for the instruction on provocation, we conclude that it was improper for the court to have given it. We conclude, however, that the impropriety was harmless under *Quintana*, for the same reasons set forth in part I B of this opinion.

## D

The last challenge the defendant raises to the charge on self-defense relates to the court's instruction on deadly physical force and imminent harm. The defendant first claims that, by instructing the jury that "[i]n this case, we are talking about the use of deadly physical force by the defendant," the court took from the jury the factual issue of what degree of force actually had been used, thereby implicitly endorsing the victim's version of events and diluting the state's burden of proof. The defendant next claims that the trial court improperly instructed the jury that it "must . . . determine whether the defendant believed that an attack was imminent or about to occur" in order to decide whether his actions justifiably were taken in self-defense. Specifically, the defendant argues that the court improperly limited its instruction to an imminent attack by the victim, when, pursuant to his account of the incident, the victim was in the process of strangling him at the time of the stabbing. According to the defendant, this impropriety implicitly favored the victim's version of events and, therefore, eased the state's burden of disproving the self-defense claim. We address the defendant's arguments in turn.

We begin with the claimed impropriety regarding the charge on deadly physical force. The following additional facts are necessary to the resolution of this issue. The defendant excepted to this portion of the instruction at trial, arguing that the degree of force used was a factual issue for the jury to decide. The state conceded as much, and the court offered to reinstruct the jury accordingly. It even went so far as to ask the defendant whether such an instruction would be satisfactory, to which the defendant replied, "Yes, Your Honor." The court then proceeded with the following supplemental instruction: "With respect to the self-defense portion of the charge, the court [has] referred to the use of

deadly physical force. Of course, it is an issue for the jury to determine whether or not deadly physical force was used and that's your decision to make." The defendant did not except to the supplemental charge.

On appeal, the defendant reasserts his objection to the trial court's original instruction on the use of deadly physical force. In accordance with our holding in *State v. Jones*, 193 Conn. 70, 475 A.2d 1087 (1984), however, we conclude that the defendant's conduct at trial indicated that he accepted the supplemental charge as sufficient to cure the claimed instructional error. In *Jones*, the trial court gave an erroneous charge on the definition of insanity, to which the defendant promptly excepted. Id., 87. Although the court did not immediately reconvene the jury to correct the impropriety, it did consult with defense counsel prior to responding to the jury's request for a copy of the legal definition of insanity. Id. Counsel agreed with the court that the proper manner in which to answer such a request would be to give a supplemental instruction in which the correct statutory standard was read aloud. Id. The court reinstructed the jury accordingly. Id. Thereafter, the defendant failed to reassert his objection to the initial charge or to object to the supplemental charge as insufficient to cure the alleged error. Id., 87–88.

On appeal, the defendant in *Jones* sought to challenge the trial court's initial charge on the definition of insanity. Id., 85–86. We found his claim to be without merit, stating that, "when viewed in the context of defense counsel's participation in fashioning the supplement[al] charge, [his] failure to except supports the . . . conclusion that the defendant accepted the supplement[al] charge as correct." Id., 88–89. We reach the same conclusion on the facts of the present case. Upon the defendant's exception to the charge on deadly force, the trial court stated that it was "willing to instruct the jury that in determining whether or not deadly physical force

was used is an issue for you the jury to decide." He then asked the defendant, "Is that satisfactory," to which the defendant responded, "Yes, Your Honor." By agreeing to the proposed instruction, and by failing to object to the supplemental charge as given, the defendant effectively conceded that it was sufficient to cure any previous impropriety. He has thus waived any right to reassert on appeal the very challenge that prompted the supplemental instruction at trial.

The defendant's brief on this issue focuses on one particular instance in which the court's reference to "deadly physical force" was, allegedly, especially prejudicial. As part of its instructions on self-defense, the trial court informed the jury of its duty to determine whether: (1) the defendant actually believed that the use of force was necessary under the circumstances; and (2) his belief was objectively reasonable. The defendant argues that this instruction, although legally necessary, was nonetheless tainted because it was "exclusively linked" to the court's prior instruction on deadly physical force. He further asserts that the court's supplemental instruction was inadequate to cure the error because it did not explain to the jury that their inquiry regarding the defendant's use of force "was a subjective-objective one and that they were required to view the event from the defendant's perspective."

In our view, this portion of the defendant's brief simply rehashes his objection at trial; the only difference being that, on appeal, the defendant points to one specific instance in which the trial court, "[b]y itself deciding that he used deadly force and by so instructing the jury . . . dismissed [his] account of events." We will not permit the defendant to gain the benefit of appellate review on a claim that he previously has waived merely by illustrating the harm he allegedly suffered by way of example. Because, as previously discussed, the defendant excepted to the court's use of the term

"deadly physical force," and because he effectively conceded that the supplemental charge was sufficient to inform the jury that the degree of force used was a factual issue for its determination, the defendant has failed to articulate any reviewable claim.

The last challenge that the defendant makes to the trial court's charge on self-defense pertains to the instruction that the jury must "determine whether the defendant believed that an attack was *imminent or about to occur*" in order to decide whether his use of force was justified. (Emphasis added.) The defendant argues that the instruction dismissed his version of events because it did not permit the jury to consider whether it was reasonable for him to believe that he was *under attack* by the victim when he responded with commensurate force. The effect of the instruction, according to the defendant, was to ease the state's burden of disproving his claim of self-defense. We disagree.

When considered in the context of the entire charge, it becomes apparent that the court, after making the incomplete statement quoted previously, subsequently instructed the jury on the appropriate inquiry. The court gave the following charge: "In this case . . . if you find proven beyond a reasonable doubt that the defendant had [no] reasonable belief *that the victim was using* or about to use *deadly physical force* . . . upon the defendant, then" the defendant's actions would not be justified. (Emphasis added.) Because this instruction stated the proper inquiry, and, in so doing, gave equal weight to the defendant's and the victim's accounts of the facts, we conclude that there is no reasonable possibility that the jury was misled by the earlier, incomplete charge.

## II

The defendant next challenges the trial court's exclusion of certain evidence that, he argues, was necessary

to establish his claim of self-defense. The following additional facts are necessary to the resolution of this issue.

At trial, the defendant sought to introduce the testimony of three witnesses that the victim, when drunk, had violently attacked and attempted to strangle them. According to the defendant, such testimony was relevant to his assertion that the victim was the aggressor in their altercation because it would tend to prove both the victim's character for violence and his specific habit of strangling people while he was intoxicated. The trial court excluded the proffered testimony, ruling that evidence of the victim's specific acts of violence was inadmissible to prove character, and that the victim's conduct was not the type of behavior traditionally contemplated as falling within the ambit of habit evidence. The court did, however, permit the defendant to make an offer of proof outside the presence of the jury. For that purpose, he questioned both the victim and Holcomb. The victim, although admitting to punching a man at a bar after he had been drinking, consistently denied ever having strangled anyone, including his roommates. Holcomb testified, to the contrary, that the victim previously had attacked and attempted to strangle both herself and Courchaine; she also testified that she had seen the victim throw a lamp at Courchaine. Lastly, Holcomb related her opinion that the victim tends to become a very violent person when he drinks.

After hearing this offer of proof, the trial court ruled that defense counsel could not question Holcomb regarding evidence of the victim's prior acts, but could elicit testimony regarding her knowledge and opinion of the victim's violent character. Holcomb testified accordingly.

On appeal, the defendant argues that the proffered testimony was admissible pursuant to either § 4-5 (c)

of the Connecticut Code of Evidence[10] to prove the victim's violent character, or § 4-6[11] of the Connecticut Code of Evidence as habit evidence. The defendant also asserts that, by excluding such testimony, the trial court deprived him of his right to present a defense under the sixth and fourteenth amendments to the federal constitution. The state maintains, to the contrary, that the exclusion was proper because proof of the victim's violent character in a prosecution for homicide or criminal assault may not be made through the use of evidence of specific acts. Moreover, the state concurs in the trial court's assessment that the victim's alleged acts of strangling others while he was intoxicated are not habit evidence as that term previously has been defined. We agree with the state.

We begin our analysis of this issue by setting forth the governing standard of review. On appeal, we must accord the trial court's evidentiary rulings great deference. See *State* v. *Vega*, 259 Conn. 374, 392, 788 A.2d 1221 (2002). Indeed, we "will make every reasonable presumption in favor of upholding [those] ruling[s] . . . [upsetting them only] for a manifest abuse of discretion." (Internal quotation marks omitted.) Id.

It is undisputed that our case law previously has dealt with the admissibility of specific acts evidence to prove the violent character of the victim in cases where the accused has claimed self-defense. It is also undisputed that, since 1927, we consistently have refused to recog-

[10] Section 4-5 (c) of the Connecticut Code of Evidence provides: "Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

[11] Section 4-6 of the Connecticut Code of Evidence provides: "Habit; Routine Practice

"Evidence of the habit of a person or the routine practice of an organization is admissible to prove that the conduct of the person or the organization on a particular occasion was in conformity with the habit or routine practice."

nize an exception in such situations to the general rule that evidence of specific acts is inadmissible to prove character unless character is directly in issue. See, e.g., *State* v. *Padula,* 106 Conn. 454, 457, 138 A. 456 (1927) ("[e]ven when proof of the general reputation of a deceased [victim] is competent, proof may not be given of specific acts of violence upon other persons which are no part of the res gestae, and in no way connected with the accused"); *State* v. *Miranda,* 176 Conn. 107, 112–14, 405 A.2d 622 (1978) (permitting, for first time, victim's convictions for violent crimes to be used to prove character and declining to carve similar exception for proof by specific acts); *State* v. *Gooch,* 186 Conn. 17, 21–22, 438 A.2d 867 (1982) (affirming trial court's exclusion of specific acts of violence committed by victim as impermissible proof of character); *State* v. *Smith,* 222 Conn. 1, 18, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992) (despite holding in *Miranda* expanding methods of proving victim's violent character, "[t]his court has not . . . departed from our precedent that specific violent acts not resulting in a criminal conviction may not be introduced to prove the victim's violent character").

Our reluctance to permit proof of the victim's violent character through specific acts evidence is in keeping with the practice endorsed by both the federal rules of evidence and the majority of other jurisdictions to have considered the issue. See *State* v. *Smith,* supra, 222 Conn. 18, citing 1A J. Wigmore, Evidence (4th Ed. 1983) §§ 63, 63.1. The reasoning behind the prohibition is simple, but persuasive: although such evidence may be relevant to the victim's character for violence, and, consequently, to the accused's assertion that the victim was the initial aggressor, its introduction "has the potential to surprise, to arouse prejudice, to multiply the issues and confuse the jury, and to prolong the trial." *State* v. *Miranda,* supra, 176 Conn. 112.

The subcommittee of the Connecticut law revision commission that initially drafted our Code of Evidence, which subsequently was adopted by the judges of the Superior Court under their rule-making authority, was cognizant of this common-law rule and the logic behind it. Indeed, § 1-2 (a) of the Connecticut Code of Evidence expressly states that one of the purposes behind its compilation was "to adopt Connecticut case law regarding rules of evidence as rules of court . . . ." Moreover, the commentary to § 1-2 (a) provides that "[b]ecause the Code was intended to maintain the status quo, i.e., preserve the common-law rules of evidence as they existed prior to adoption of the Code, its adoption is not intended to modify any prior common-law interpretation of those rules."

Consistent with this stated purpose and vision, § 4-4 of the Connecticut Code of Evidence embodies, in relevant part, the holding of *Padula* and its progeny. Section 4-4 (a) (2) permits the accused in a homicide or criminal assault case to introduce evidence of the victim's violent character, after laying the foundation for a claim of self-defense, in order to prove that the victim was the aggressor.[12] Subsection (b) of § 4-4 provides that proof of the victim's violent character may be made through reputation or opinion testimony or by evidence of the victim's conviction of a violent crime.[13]

---

[12] Section 4-4 of the Connecticut Code of Evidence provides in relevant part: "(a) Character evidence generally. Evidence of a trait of character of a person is inadmissible for the purpose of proving that the person acted in conformity with the character trait on a particular occasion, except that the following is admissible . . .

"(2) Character of the victim in a homicide or criminal assault case. Evidence offered by an accused in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor, or by the prosecution to rebut such evidence introduced by the accused. . . ."

[13] Section 4-4 (b) of the Connecticut Code of Evidence provides: "Methods of proof. In all cases in which evidence of a trait of character of a person is admissible to prove that the person acted in conformity with the character trait, proof may be made by testimony as to reputation or in the form of

The commentary to subsection (b) of § 4-4, in referring to the case law previously cited, clarifies that "[e]vidence of violent acts not having resulted in [a] conviction is not admissible." Conn. Code Evid. § 4-4 (b), commentary, citing *State* v. *Smith,* supra, 222 Conn. 18; C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.17.4, p. 227, citing Conn. Code Evid. § 4-4 (b), commentary, and *State* v. *Miranda,* supra, 176 Conn. 114 ("[s]pecific acts of violence not the subject of a conviction are still inadmissible" to show victim's character for violence).

Despite our well established common-law rule and its subsequent codification in § 4-4 of the code, the defendant argues that the excluded testimony was nonetheless admissible under § 4-5 (c) of the code. Section 4-5 (c) of the Code of Evidence provides: "In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct." The defendant argues that character is "in issue," pursuant to § 4-5 (c), when it is "a material fact that under the substantive law determines rights and liabilities of the parties." 1 C. McCormick, Evidence (5th Ed. 1999) § 187, p. 651. Because the victim's character trait for violence, if proven, would be "an operative fact in determining [whether] he had been the aggressor," the defendant argues, such a trait was "in issue" in relation to his claim of self-defense. We disagree with the defendant's interpretation of § 4-5 (c) and, therefore, we conclude that the proffered testimony was inadmissible under that code section.

In propounding his argument regarding § 4-5 (c) of the code, the defendant ignores that portion of § 1-2 of

an opinion. In cases in which the accused in a homicide or criminal assault case may introduce evidence of the violent character of the victim, the victim's character may also be proved by evidence of the victim's conviction of a crime of violence."

the code and its commentary, previously cited, which indicates that the code was intended only to codify the common law. If, as the defendant suggests, we were to read § 4-5 (c) as permitting introduction of evidence regarding a victim's specific violent acts, we would be interpreting the code in a manner that would effectuate a substantive change in the law. Because such a result would be contrary to the express intention of the code's drafters, we reject it.

The defendant's assertion that the proffered testimony was admissible pursuant to § 4-5 (c) also fails because it effectively would read § 4-4 (b) out of the code. As discussed previously, § 4-4 (b) specifically limits the methods of proving the victim's character in a homicide or criminal assault prosecution to reputation or opinion testimony, or evidence of prior convictions for violent crimes. This limitation reflects a conscious choice by the code's drafters to exclude specific acts evidence as permissible proof, consonant with our case law. Were we to adopt the defendant's argument and read § 4-5 (c) to permit what § 4-4 (b) forbids, we would nullify this intentional exclusion of specific acts evidence and thus violate the well established maxim that " 'statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . .' " *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 158, 788 A.2d 1158 (2002); see *Thalheim* v. *Greenwich*, 256 Conn. 628, 639, 775 A.2d 947 (2001) (rules of statutory construction apply with equal force to rules of practice). Accordingly, to give effect to both provisions of the code, we reject the defendant's interpretation of § 4-5 (c).

Our conclusion that evidence of a victim's specific acts is inadmissible pursuant to § 4-5 (c) of the code to prove his character for violence is also in accord with that canon of statutory construction that provides: "[W]hen general and specific statutes conflict they

should be harmoniously construed so the more specific statute controls." (Internal quotation marks omitted.) *Skindzier* v. *Commissioner of Social Services*, 258 Conn. 642, 654, 784 A.2d 323 (2001). Because § 4-4 of the code explicitly provides for the admissibility of evidence concerning the victim's violent character under certain specified circumstances, it trumps the more general rules set forth in § 4-5 regarding the admissibility of specific acts. Thus, § 4-5 (c) does not apply to evidence of the victim's violent character in homicide or criminal assault cases, which is specifically covered by § 4-4, but rather applies to evidence admitted to prove the issues enumerated in § 4-5 (b).[14]

The defendant argues, alternatively, that the proffered testimony was admissible as habit evidence under § 4-6 of the code. Section 4-6 of the Code of Evidence provides in relevant part: "Evidence of the habit of a person . . . is admissible to prove that the conduct of the person . . . on a particular occasion was in conformity" therewith. According to the defendant, because the prohibition on specific acts evidence does not apply to § 4-6, the excluded testimony was admissible under that code section to establish that the victim had a habit of strangling people while he was intoxicated. We disagree that the victim's alleged conduct rises to the level of a habit as that term is contemplated by the evidentiary rule, and, accordingly, we approve of the exclusion as proper.

Habit evidence, unlike that offered to establish a trait of character, typically illustrates "a 'person's regular practice of responding to a particular kind of situation with a specific type of conduct.' " Conn. Code Evid. § 4-

---

[14] Section 4-5 (b) of the Connecticut Code of Evidence provides in relevant part: "Evidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

6, commentary, quoting 1 C. McCormick, supra, § 195, p. 686. Our case law concerning this type of evidence, although sparse, suggests that habit is not relevant to prove wilful or deliberate acts. See *Moffitt* v. *Connecticut Co.*, 86 Conn. 527, 532, 86 A. 16 (1913); C. Tait, supra, § 4.21.3, p. 251. Because the code was intended to embody our common-law rules of evidence, we conclude that § 4-6 should not be interpreted to encompass specific instances of intentional violent conduct.

The defendant cites to *Perrin* v. *Anderson*, 784 F.2d 1040 (10th Cir. 1986), for the contrary conclusion, namely, that a victim's violent acts may be admissible as habit evidence to help establish an accused's claim of self-defense. In that case, brought pursuant to 42 U.S.C. § 1983, the defendant police officers were alleged to have deprived the plaintiff's decedent of his civil rights when they shot and killed him while investigating a traffic accident in which he had been involved. Id., 1043. The trial court had allowed the defendants to introduce the testimony of four other officers that they previously had been involved in violent encounters with the decedent. Id./According to the defendants, this evidence tended to prove that the decedent was the first aggressor in their altercation, and thus was relevant to their self-defense claim. Id., 1044. The plaintiff argued on appeal that the admission of such evidence was error. Id. The Court of Appeals for the Tenth Circuit disagreed, and affirmed the trial court's judgment. Id., 1046. In so doing, the court concluded that the testimony was admissible under rule 406 of the Federal Rules of Evidence, the analog to § 4-6 of the Connecticut Code of Evidence, to show that the decedent had a habit of reacting violently to the uniformed police officers. Id.

Contrary to the defendant's assertion, *Perrin* does not control our interpretation of § 4-6 of the Code of Evidence and its application to the facts of the present

case. We have indicated that, under our case law, habit evidence is irrelevant to prove wilful or deliberate acts. See *Moffitt* v. *Connecticut Co.*, supra, 86 Conn. 530. Even if we were to overrule *Moffitt* and permit the use of habit evidence for that purpose, we are still convinced that the proffered testimony would be insufficient to rise to the level of habit. At trial, the defendant contended that he had three witnesses who would testify that the victim previously had attempted to strangle them while he was intoxicated. Only one, however, Holcomb, testified in an offer of proof. Moreover, her statement was somewhat equivocal; although suggesting that the victim had attempted to strangle both her and Courchaine while he was drunk, Holcomb neglected to relate the frequency of these incidents or the circumstances under which they occurred. *Perrin* itself acknowledged that five instances of specific, repeated conduct are insufficient to establish the existence of habit. See *Perrin* v. *Anderson*, supra, 784 F.2d 1046. On the basis of the record before us, the defendant may have been able to establish two or three incidents at most. Thus, the defendant's argument that the testimony was admissible as habit evidence fails even under the rule as articulated in *Perrin*.

### III

The defendant's final claim relates to the propriety of the trial court's charge to the jury that "[t]he case essentially boils down to your determination of [the] credibility of witnesses." The defendant argues that this instruction effectively authorized his conviction on a lesser standard of proof than beyond a reasonable doubt in violation of his constitutional rights. The state argues that, when read in the context of the entire charge, the challenged instruction did not have the effect of diluting its burden of proof as the defendant suggests. We agree with the state.

As with many of the defendant's previous claims, the challenge to the previously quoted charge was not properly preserved for appeal. The defendant thus seeks to prevail under *Golding*. Again, we conclude that the first two prongs of the test established in that case are satisfied: (1) the record is adequate for review; and (2) the defendant has a fundamental right to have the state prove the charges against him beyond a reasonable doubt; *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); thus rendering his claim constitutional in nature. Because we conclude that the alleged impropriety does not exist on the facts of this case, however, the defendant's claim fails under *Golding*'s third prong.

The challenged instruction was given immediately following the court's charge on the elements of self-defense and the exceptions thereto. The charge provides, in its entirety, as follows: "The case essentially boils down to your determination of credibility of witnesses. You will have to consider [the victim's] account of the incident as to whether [the defendant] followed him into the bedroom, pushed him against the dresser, and then [the victim] felt something hit him on the side a couple of times.

"Credibility of witnesses is the determination made by the jury. Some of the physical evidence or lack of physical evidence may be employed in assessing credibility. You will have to weigh [the victim's] account against [the defendant's] account. Upon testifying, [the defendant] can be evaluated like any other witness. His account is essentially at odds with [the victim's] account. He testified that [the victim] went crazy, jumped on the couch shaking and choking him with both hands around his neck. Again, physical evidence or lack of physical evidence can be utilized in assessing the witness' credibility.

"If you accept [the defendant's] account, then you will have to determine whether his use of deadly physical force was justified—as I have previously explained—and whether the state proved beyond a reasonable doubt that it was not. Ultimately, these are questions for your determination. In any event, the state must prove beyond a reasonable doubt that [the defendant] did commit assault in the first degree and must show beyond a reasonable doubt that his use of deadly physical force was not justified. Ultimately, all questions of fact relating to the elements and defenses in this case are matters for your determination."

We previously have observed that comparative credibility instructions, such as the one presently at issue, "have been widely criticized" as tending "to treat the matter of proof as a 'fair fight' between the prosecution and the defense rather than as one weighted in favor of the latter by the necessity of proving guilt beyond a reasonable doubt." *State* v. *Orsini*, 187 Conn. 264, 276, 445 A.2d 887 (1982). We have not, however, established an unqualified rule that such instructions are inherently improper. Rather, we have examined each comparative credibility instruction on a case-by-case basis to determine, in the context of the entire charge, whether it "reasonably [can] be regarded as diluting the burden of proof resting upon the state . . . ." Id. In performing that same inquiry on the record currently before us, we can discern no basis from which to infer that the challenged instruction impermissibly authorized the jury to convict the defendant without the requisite finding that the state had proven the charges against him beyond a reasonable doubt.

The trial court's initial instructions to the jury in this case spanned a total of thirty-one pages; its supplemental instruction and reinstruction consisted of an additional six pages. Only once in the course of this entire charge did the court suggest that the central issue in

the case was one of credibility; only once did the court explicitly reference weighing the defendant's version of the facts against that of the state. When compared with the more than seventeen instances in which the court instructed the jury that the defendant was presumed innocent until proven guilty, and that the state bore the burden of both proving the charges against the defendant and disproving his claim of self-defense beyond a reasonable doubt, we conclude that there is no reasonable possibility that the jury was misled with respect to the state's burden of proof. See *State* v. *Martin*, 211 Conn. 389, 395, 559 A.2d 707 (1989) (where court instructed jury that it could consider whether witness' testimony was true in assessing their credibility, "[t]he instruction did not remotely suggest . . . that the state's ultimate burden to prove all the elements of [the crime] beyond a reasonable doubt was diminished in any respect. In fact, the trial court, in a charge that covered . . . eighteen pages of transcript, informed the jury on at least eight occasions that the state bore the burden of proving all the elements of the offense charged beyond a reasonable doubt."); *State* v. *Orsini*, supra, 187 Conn. 277 ("[T]he trial judge repeatedly stressed that the state had the burden of proving each element of the crimes charged beyond a reasonable doubt. He also advised the jury that the defendant was not obliged to prove his innocence . . . . In the context of the entire charge . . . the isolated statement under fire cannot reasonably be said to have had any potential for lessening the burden of the state or imposing a burden upon the defendant.").

Our conclusion is bolstered by the fact that the court, immediately after giving the comparative credibility instruction, reiterated that "[i]n any event, the state must prove beyond a reasonable doubt that [the defendant] did commit assault in the first degree and must show beyond a reasonable doubt that his use of deadly

physical force was not justified." Moreover, in response to a request by the jury, the court reread that portion of its charge pertaining to the crime of assault in the first degree. In so doing, the court reinstructed the jury that, to find the defendant guilty, it must first determine that the state had proved the elements of the crime beyond a reasonable doubt; it then repeated this burden of proof when discussing each element of the crime in detail. Because this was the last instruction the jury heard prior to engaging in its deliberations, there is no doubt but that it was left with a correct understanding of the state's obligation with respect to proving the crime charged and disproving the defendant's claim of self-defense. See *State* v. *Faust*, 237 Conn. 454, 473, 678 A.2d 910 (1996) (" 'a supplemental charge is likely to enjoy special prominence in the minds of the jurors because it is fresher in their minds when they deliberate' "). Accordingly, we determine that there is no reasonable possibility that the jury was misled by the court's comparative credibility instruction into believing that the state's burden of proof was less than the constitutionally mandated standard of beyond a reasonable doubt.

The defendant argues that the instruction presently at issue is similar to that which the Court of Appeals for the Fifth Circuit in *United States* v. *Oquendo*, 490 F.2d 161 (5th Cir. 1974), found to be constitutionally offensive. We disagree with the defendant's attempted analogy, and thus conclude that the result in *Oquendo* does not control our analysis of this issue.

The trial court in *Oquendo* gave the following instruction with respect to the proper resolution of conflicting testimony: " 'It is just a question of who you believe. . . . [I]f you believe the story of the [d]efendant here . . . you should acquit him. If you don't believe him, and [you] believe the story [given by the state's witness] . . . [t]hen there is no doubt that the man ought to be

convicted.' " Id., 164. Subsequently, in charging the jury on the particular defense raised, the trial court stated: " '[I]f . . . you feel that it is a contrived defense . . . and you feel that [the state's witnesses] were telling the truth, then you shouldn't have the slightest hesitation to find the [d]efendant guilty. . . . [I]f you find it happened as [the defendant] said, not guilty. If you find it as the [state's witness] said, guilty.' " Id., 165. Finally, the trial court gave a supplemental charge to the jury in which it noted that " 'in my opinion . . . the gist of the situation here is [whether the state's informant planted drugs on the defendant, and whether those were the drugs actually recovered]. If he did, you ought to acquit him. If he didn't, and this is the story made up . . . by a clever defendant . . . then he is not entitled to [the defense of entrapment], and you should just as quickly convict him. It is as simple as that, members of the jury, it is a yes or no answer. Do you believe the defendant, who has everything at stake, or do you believe the informer, who has no charges pending.' " Id.

Unlike the trial court in the present case, the trial court in *Oquendo* repeatedly cast the jury's ultimate determination, namely, whether to convict or acquit the defendant, as a credibility choice between the defendant and the state's witnesses. By instructing the jury, on three separate occasions and in three different contexts, that its decision effectively hinged on the believability of the witnesses who had testified at trial, the trial court in *Oquendo* did create the risk that the jury might either ignore the state's burden of proof altogether or misconstrue it as less than beyond a reasonable doubt. The Court of Appeals thus correctly concluded that the trial court's instruction amounted to reversible error.

The same risk that the Court of Appeals disapproved of in *Oquendo*, however, was not present on the facts of this case, where the trial court made only two passing

allusions to the comparative credibility of the witnesses and multiple correct references to the state's burden of proof. Moreover, the trial court's supplemental instruction in *Oquendo*, rather than curing its previous misstatements as did the court's reinstruction in the present case, magnified the error by reiterating that the outcome of the case rested on a simple " 'yes or no answer' " to the question, "[d]o you believe the defendant . . . or do you believe the [state's witness] . . . .' " Id. The factual dissimilarities between the comparative credibility instruction in *Oquendo* and the instruction at issue in the present case lead us to conclude that *Oquendo* is not authoritative. Accordingly, the defendant's claim of impropriety must fail.

The judgment is affirmed.

In this opinion the other justices concurred.